35 Wn.2d 465 (1950)
214 P.2d 171
MARY EVELYN BENEDICT, Respondent,
v.
BOARD OF POLICE PENSION FUND COMMISSIONERS OF THE CITY OF SEATTLE et al., Appellants.[1]
No. 31058.
The Supreme Court of Washington, Department One.
January 18, 1950.
A.C. Van Soelen and Glen E. Wilson, for appellants.
Kennett & McCutcheon, for respondent.
BEALS, J.
The late Virgil Benedict and Mary Evelyn Benedict were for many years husband and wife, and had one son, Richard, who was twelve years of age June 4, 1948, the date of his father's death. Virgil Benedict joined the police force of the city of Seattle in 1937, and was on active duty as an officer until his death.
June 4, 1948, after his afternoon tour of duty, Officer Benedict went to his home. During the early evening, a neighbor called on him, stating that people near her home were chopping trees in the public street. Officer Benedict, taking his police badge and service revolver, went to the place where the chopping had been going on, but, the offenders having departed, he went home, after visiting with the neighbor and her husband for about fifteen minutes.
Upon his arrival at his home, Officer Benedict went into the bathroom and hung his loaded revolver on a hook, over a coat or some article of clothing, then went into the kitchen, where he sat at a table at which Mrs. Benedict was also seated. Officer Benedict was drinking a cup of *467 coffee, and, while so engaged, his son, Richard, entered the kitchen from the living room and went into the bathroom, where he remained a short time. Richard then opened the bathroom door, leading into the kitchen, whereupon Mrs. Benedict looked at him and observed him standing in the doorway with his father's revolver in his hand. Officer Benedict was sitting in such a position that the left rear portion of his head was toward the bathroom door. Richard raised the revolver and discharged it, the bullet striking his father in the head, inflicting a mortal wound.
In due time, Mrs. Benedict filed with the board of police pension fund commissioners her application for a pension, claiming that she was entitled to receive it pursuant to Rem. Rev. Stat. (Sup.), § 9585 [P.P.C. § 373-13], which reads in part as follows:
"Whenever any member of the police department of any such city shall lose his life through violence while actually engaged in the performance of his duty as such police officer, leaving a widow or child or children under the age of sixteen years, then upon satisfactory proof of such facts made to it, such board shall order and direct that a yearly pension, equal to one-half of the amount of the salary attached to the rank which such member held in said police department at the time of his death, shall be paid to such widow during her life, or if no widow, then to the child or children, until they shall be sixteen years of age: ..."
Her petition was heard by the board October 5, 1948, Mrs. Benedict appearing in person and by her attorney. A member of the staff of the corporation counsel of the city of Seattle participated in the hearing. Mrs. Benedict testified before the board, as did the lady who had requested Officer Benedict's assistance on the evening referred to, and the physician who had performed an autopsy. The proceedings before the board were reported, and a typed transcript thereof prepared.
The board denied Mrs. Benedict's application for a pension upon the ground that, at the time of Officer Benedict's death, he was not actually engaged in the performance of his duties as a police officer.
*468 Thereafter, Mrs. Benedict, as relator, filed with the clerk of the superior court for King county her petition for an alternative writ of mandate directed to the board of police pension fund commissioners of the city of Seattle. An alternative writ was issued, requiring the board either to forthwith approve Mrs. Benedict's application for a pension or show cause, at a date specified, why a writ should not issue directing that the pension be allowed.
The respondents demurred to the alternative writ, also moving to quash the same and filing an answer thereto.
When the matter was called for trial, both parties appearing (relator in person and by her counsel and the respondents by the corporation counsel of the city of Seattle), the respondents' demurrer was argued and overruled, whereupon the court heard the witnesses called by relator and admitted in evidence the exhibits which she offered, including a certified transcript of the hearing before the board. At the close of the case, the court delivered its oral decision, reviewing the evidence and directing that the writ of mandate sought by relator should issue, "not that the Board acted arbitrarily and capriciously, but that it improperly applied the law to the facts."
Thereafter, the court entered its findings of fact and conclusions of law, followed by a judgment reciting the preliminary proceedings and ordering that a peremptory writ of mandate issue, directed to the respondent board, commanding it to forthwith allow a pension to the relator.
From this order and judgment, respondent members of the board have appealed to this court.
Appellants assign error upon the entry of three findings of fact and the court's conclusion of law to the effect that the writ should issue; upon the refusal of the trial court to make findings of fact as proposed by appellants; and upon the entry of the order and judgment from which they have appealed.
At the hearing before the superior court, three witnesses only were called by respondent, namely, W.C. Thomas, the comptroller of the city of Seattle, who was a member of *469 the police pension board and acting as its secretary; Ernest Truesdale, a civilian clerk in the employ of the Seattle police department, whose duty it was to keep the official records of the board of police pension fund commissioners; and James Lawrence, a captain in the police department. The appellants called no witnesses.
Mr. Thomas testified that he attended three meetings of the board, one in July, one in August, and the last in October, at which meeting evidence under oath was taken concerning the circumstances connected with the death of Officer Benedict.
A typed transcript of the evidence introduced by respondent before the police pension board at its meeting held October 5, 1948, was identified and introduced in evidence before the superior court.
Mr. Truesdale produced and identified certain letters in connection with respondent's claim, which were introduced in evidence; read into the record portions of the minutes of the meetings which referred to the claim; identified two memoranda, one signed by Mr. Thomas, and the other by William Devin, the mayor of the city, who was also a member of the board, and a copy of the verified application for a pension by Mrs. Benedict, and a copy of a letter from her counsel to the board, dated September 3, 1948, requesting the formal hearing at which testimony would be submitted, which was later held as above stated.
An exhibit consisting of a letter, dated September 7, 1948, from the board to the corporation counsel, requesting an opinion advising the board as to the interpretation to be given the words "`while actually engaged in the performance of his duty as a police officer,'" as contained in Rem. Rev. Stat. (Sup.), § 9585, supra, together with a copy of the corporation counsel's answer, was also received in evidence before the court.
At the hearing held October 5, 1948 (as disclosed by the transcript which was introduced in evidence), Dr. Gale Wilson, a practicing physician and surgeon, testified before the board that he had performed an autopsy upon the body of Virgil Benedict. The doctor stated that death was caused *470 by a bullet wound in the head; that the bullet (a ".38 caliber") entered at the outer corner of the left eye, went through the eyeball, through the back of the nose, the base of the brain, and lodged in the middle portion of the right ear, and that there were no powder burns. The witness testified that "from the point of entrance to the point where the bullet was lodged would be an almost straight line or perhaps a half an inch rise from one side to the other." The transcript of the testimony of Dr. Wilson, introduced before the board, discloses the following:
"Q. (By Capt. Lawrence) In your opinion did that man see that shot fired? A. I should think he could. Of course, I don't know where his eyes were at the time of impact but the course was such that if you would project that line outwards, even if he were looking straight ahead he could see a person holding the gun. If he simply rotated his eyes slightly he could see the individual perfectly. Q. (By Mr. Kennett) And if he had turned his head toward the individual, he would have that much better view of him? A. Well, if he turned his head it would change the course of the bullet to some extent. I am projecting from where the bullet lodged to where it entered out into space from where it came. It would be what you might call a quartering shot, half off to the side, but it should be within the range of vision. Q. Like I am looking at Sylvester but I can see you and Glen Wilson while I am looking at Sylvester, that is the point you make, is it? A. That's right.
"CAPT. CHAFFEE: Doctor, would you say that the course of this bullet was slightly upward? THE WITNESS: Yes, sir. Q. (By Capt. Chaffee) Would that indicate that he was sitting passively in the chair or he was about to arise from the chair? A. I can't say as to that. Q. A man about to arise from a chair would lean forward, wouldn't he, and wouldn't that tend to make the course of the bullet downward? A. It involves so many unknown factors that just simply a very slight tilt of the head would make a half-inch difference  about what there was there. It was as close to being parallel to the floor as you could expect a bullet to pass.
"MAYOR DEVIN: Couldn't you tell what position the eyes were in from the position that the bullet entered? That is, if a man was looking that way (indicating), the bullet would *471 enter the far side of his eye, while if he was looking that way (indicating), the bullet would enter the colored portion of the eye? THE WITNESS: Except in this case it was a .38 caliber and it just ripped the whole eye out. There was not enough there to tell actually. Q. (By Mr. Kennett) Answering again a question that Capt. Chaffee asked you: The course of the bullet upward or downward would depend upon the height the weapon was held above the floor at the time it was fired with relation to the sitting man, wouldn't it? A. It would simply indicate that the plane from which it entered was not absolutely at a right angle to the skull but at very slight angulation so that the bullet passed upwards approximately a half inch in the course of about six inches. What position the head was in, you can't actually say whether it was tilted forwards or backwards or upwards except that the bullet went that certain way."
Officer Benedict died, without regaining consciousness, a very short time after he was shot.
Mrs. Inez Benefiel testified that she was a neighbor of the Benedicts, and, on the evening of June 4th, requested Officer Benedict to investigate some tree chopping in the street near her home; that the officer complied with her request, taking his service revolver, which was attached to a strap across the officer's chest; that, when they arrived at the place where the chopping had been heard, there was no one there, and that, after visiting with the witness and her husband about fifteen minutes, Officer Benedict returned to his home. The witness further stated that, shortly thereafter, she heard a shot, and was summoned to the Benedict home by the officer's son. When she arrived, she saw Officer Benedict lying wounded on the floor, his feet resting at about the center of the kitchen table, his body being at an angle therefrom. The witness applied digital pressure to the wound until an ambulance arrived to take the wounded man to a hospital.
As shown by the transcript of respondent's testimony before the board, she and Officer Benedict were married in 1933, and had one child, Richard, referred to above.
A diagram, drawn to scale, of the kitchen and bathroom, was identified and introduced in evidence. The kitchen was *472 twelve by fourteen feet in size (outside measurements), and, at the time of Officer Benedict's death, contained the following: a cooking stove on the westerly portion of the south wall; a table close to the west wall, beneath a window, and standing about the center of the wall; a refrigerator on the east wall, north of the center.
The bathroom, ten feet in length, adjoined the north two thirds of the easterly wall of the kitchen. The door leading into the bathroom from the kitchen was a very little south of the center of the east wall of the kitchen.
Respondent and her husband were seated at the table, drinking coffee. Respondent was seated at the south end of the table, near the southeast corner thereof. Officer Benedict was sitting at the east side of the table, a short distance north of the southeast corner thereof, and about eight feet from the bathroom door. Both were sitting at an angle to the table, facing each other.
Richard came into the kitchen from the living room and entered the bathroom. After a short space of time, Richard opened the bathroom door, and respondent, looking up, saw him standing in the doorway with the revolver in his hand. Respondent testified that the left rear portion of her husband's head was toward the bathroom door. In response to a question by her counsel, "When you took your gaze from your husband to look at the door as it opened, do you know whether your husband also turned to look at the door?", respondent said: "Yes, sir; he did look." Just at this instant, Richard fired the revolver, the bullet striking Officer Benedict's head, as above described. Officer Benedict uttered no sound.
Respondent testified that, before the shot was fired, her husband was sitting with his legs crossed, and that, after the shot was fired, she noticed that his legs were uncrossed, although she did not testify that she saw him uncross them. Respondent also testified that she did not observe her husband attempt to rise from the chair, and that the shot was fired at practically the instant that she saw her son standing in the doorway. She said nothing by way of warning *473 or otherwise prior to the shot. Respondent further testified that she did not immediately identify the weapon as her husband's service revolver, but thought that it was one of her son's toy guns, stating that her husband would have had time to recognize the revolver as his own. She testified that, prior to the firing of the shot, there was not time for her husband to turn his body, but that there was time for him to turn his head. She assumed that the expression on her own face when she saw the boy at the door probably caused her husband to turn and look.
Mrs. Benedict testified that, when the boy was about four and one-half years old, he had picked up her husband's service revolver, and that Officer Benedict had quickly taken it away from the lad.
Of course, the best evidence as to the position of Officer Benedict's head at the time the shot was fired is the course of the fatal bullet, described in detail by Dr. Wilson.
After Officer Benedict was shot, he remained seated in the chair, and respondent held him a moment and then "tipped him and the chair over onto the kitchen floor."
Pursuant to the regulations of the Seattle police department, an officer thereof is required at all times, whether on or off duty, to have his service revolver available, and to initiate appropriate police action to preserve the public peace, arrest law violators, prevent crime, and protect life and property.
[1] By pointing a loaded revolver at his father, Richard Benedict was committing the crime of assault in the second degree, and, if Officer Benedict observed his son's act, it was the officer's duty to take appropriate action to terminate the offense which was being committed by his son.
[2] Police pension laws should be liberally construed. 62 C.J.S. 1195, § 588d. If Officer Benedict was shot while actually engaged in the performance of his duty as a police officer, respondent should receive the appropriate pension provided for by statute.
Respondent's counsel contends
"... that the evidence before appellant Board, both direct and circumstantial, clearly and unerringly pointed *474 to the fact that Virgil Benedict, before he was shot, became aware that his son was committing a crime, and was initiating proper police action at the time he was killed. There is not one single word of evidence, nor any circumstantial evidence, to the contrary."
[3] This proceeding was instituted by respondent by way of an application for a writ of mandate. In connection with the purpose and scope of such a writ, the following texts are pertinent:
"It is available also to compel action, when refused, in matters involving judgment and discretion, but not to direct the exercise of judgment or discretion in a particular way, or the retraction or reversal of action already taken in the exercise of either." 34 Am. Jur. 810, § 4.
"While an officer may be compelled by mandamus to exercise his discretion one way or another, and not just simply refuse to act at all, yet, after he has honestly and reasonably exercised his discretion, mandamus will not lie, where the act is truly discretionary, to control that discretion as to the particular manner of performance, even though the discretion be erroneously exercised and there is no other method of review or correction provided by law." Ferris, Law of Extraordinary Legal Remedies, 240, § 208.
"The writ lies to make a body or officer charged with a duty, involving judgment or discretion, take action in the matter. When a subordinate body is vested with power to determine a question of fact, the duty is judicial, and though it can be compelled by mandamus to determine the fact it cannot be directed to decide in a particular way, however clearly it may be made to appear what that decision ought to be." Merrill, Law of Mandamus, 33, § 32.
"But the action of an officer in a matter which calls for the exercise of his discretion or judgment will not be reviewed by the writ of mandamus, unless he has been guilty of a clear and wilful disregard of his duty, or such action is shown to be extremely wrong or flagrantly improper and unjust, so that the decision can only be explained as the result of caprice, passion or partiality." Merrill, Law of Mandamus, 45, § 41.
Concerning the review, by an application for a writ of mandate, of a ruling by the civil service commission of the *475 city of Seattle, in the recent case of Adams v. Seattle, 31 Wn. (2d) 147, 195 P. (2d) 634, this court said:
"It must be remembered that this is an action in mandamus. Mandamus will only lie to compel the performance of a duty enjoined by law, and does not lie to control discretion. The only question presented in this case, therefore, is whether there was any duty enjoined by law which compelled the civil service commission to classify `maintenance laborer' as a separate position for purposes of examination, and further, if such duty was not enjoined, whether the action of the civil service commission was so arbitrary and capricious as to violate the city charter of the city of Seattle."
The judgment of the superior court, dismissing the proceeding was affirmed. See also State ex rel. Farmer v. Austin, 186 Wash. 577, 59 P. (2d) 379.
In 34 Am. Jur. 858, § 68, appears the following text:
"With respect to duties that are not peremptory, the officer must be left free to decide whether he will perform the act demanded or secure by appropriate procedure a judicial determination of the extent of his duty. In such cases, where, as to the facts, there exists any admissible doubt or reasonable men might conscientiously differ with respect thereto, the courts have with practical unanimity declined to interfere by mandamus, and whenever an element of discretion enters into the duty to be performed, the functions of mandatory authority are shorn of their customary potency and become powerless to dictate terms to that discretion."
The opinions in City of Clarksdale v. Harris, 188 Miss. 806, 196 So. 647, and Thomas v. Ragsdale, 188 Ga. 238, 3 S.E. (2d) 567, are also of interest in connection with this question.
[4] It is, of course, true that, if any official, person or board has acted so arbitrarily or capriciously that a court would be justified in holding that no discretion was exercised, the writ of mandate is available to compel appropriate action. State ex rel. Yeargin v. Maschke, 90 Wash. 249, 155 Pac. 1064; State ex rel. Sater v. State Board of Pilotage Commissioners, 198 Wash. 695, 90 P. (2d) 238.
*476 In the case of Carleton v. Board of Police Pension Fund Commissioners, 115 Wash. 572, 197 Pac. 925, it appeared that Edna Carleton, the widow of an officer of the Seattle police department, applied to the board of police pension fund commissioners for the pension allowed by law to the widow of a police officer who had lost his life through violence, while engaged in the performance of his duty as such officer. The board rejected Mrs. Carleton's application, whereupon she applied to the superior court for a writ of review, which was granted. The board filed its return to the writ, showing that the application had been denied. Thereafter, over the objections of the board, the superior court received original evidence, and found that Mrs. Carleton was entitled to a yearly pension. On appeal by the board, this court held that the trial court had erred in receiving evidence. In the course of the opinion, we said:
"The right to such a pension has been created by statute, whereby the legislature has provided for a special board or tribunal and vested it with power and authority to determine the rights of applicants, and to order and direct payments out of the pension fund. In the discharge of its duties, it exercises judicial functions. It is required (Rem. Code, § 8088) to keep a record of its proceedings which shall be a public record. It has the power (§ 8089) to compel the attendance of and administer oaths to witnesses, and to provide for the payment from the pension fund of all necessary expenses and printing. The jurisdiction to hear and determine such applications is in the board of police pension fund commissioners, not in the superior court....
"The situation called for the determination of questions of fact of which the members of the board, performing judicial functions were the triers. In the discharge of that duty, it is clear from the statute that, the members of the board could not act upon their personal knowledge of the facts (People ex rel. Haines v. Smith, 45 N.Y. 772) but were called upon to allow the applicant's testimony before finally disposing of the matter."
The judgment appealed from was reversed, with directions
"... to enter a judgment annulling the order and decision of the board made on August 2, 1920, by which *477 the application was rejected without the taking of testimony."
In the case cited, it appeared that the board had acted upon the widow's claim without hearing evidence that she desired to introduce. Of course, in the case at bar, a hearing was accorded respondent, who appeared in person and by her counsel, and, so far as the record discloses, presented all the evidence which she desired to submit to the board.
In the case of Darnell v. Seattle, 29 Wn. (2d) 713, 189 P. (2d) 243, this court reversed a judgment of the superior court, entered in favor of the relator, in an action for a writ of mandate to compel the reinstatement of the relator as an officer of the Seattle police department. The trial court found that the city health officer had acted in an arbitrary and capricious manner, and based its judgment upon that finding. In reversing the judgment, we said:
"We do not agree with the trial court for two reasons: first, because the facts do not warrant such a finding; and second, because the superior court does not have authority to overrule the decision of the board merely upon a showing of arbitrary and capricious action on the part of the city health officer....
"The trial court could not, in the instant case, grant the relief prayed for upon a finding, if such had been the case, that the city health officer acted arbitrarily and capriciously. The only finding which would warrant the issuance of a writ, would be that the board itself acted arbitrarily and capriciously. We find nothing in the record to indicate that the board acted in other than a fair and impartial manner....
"The court, no matter how strongly it might desire to assist respondent out of the unfortunate position in which he is placed, is powerless to act. Courts have no right to usurp the powers granted by the legislature to the police pension fund board."
Respondent argues that, at the time of his death, Officer Benedict had, under the law, a vested right in the pension fund, and that respondent, on her husband's death, succeeded to this right, citing Luellen v. Aberdeen, 20 Wn. (2d) 594, 148 P. (2d) 849, in which this court held that a *478 police officer has a vested right to the statutory benefits, provided that he has met all the requirements of the statute.
[5] In the case at bar, respondent's right to the particular benefit which is the subject matter of this action, depends upon whether or not her late husband met his death in the performance of his duties as a police officer. This was the question properly presented to appellants, as members of the board of police pension fund commissioners, whose decision of that question respondent attacked by her application for a writ of mandamus, filed with the superior court.
In his brief, respondent's counsel states that the board has refused to pay respondent the sum of one thousand dollars, "as contemplated by the statute in those cases in which a pension is not warranted."
From the record before us, it does not appear that appellants have taken any such action, and, in their reply brief, appellants state that respondent has made no demand for the sum referred to, and that the board has never taken any action in connection with that matter. In any event, that question is nowise before us.
[6] Upon this appeal, appellants present for review the action of the superior court in issuing a writ of mandate, holding that, on the facts, respondent "is entitled as a matter of right to a pension as provided" by statute, and directing appellants to forthwith allow to respondent the statutory pension. By this order, the trial court reversed the action of appellants, as members of the board, and directed them to enter an order contrary to that which they had previously entered. Of course, it was the duty of appellants, as a board, to consider all angles of the question presented to them for determination. They were not limited to respondent's own testimony, but could consider the entire record before them and draw conclusions from all the evidence before the board.
Respondent relies upon the case of In re Gifford, 192 Wash. 562, 74 P. (2d) 475, in which this court affirmed a *479 judgment of the superior court reversing (in a proceeding by way of a writ of review) an order of the board of trustees of the firemen's relief and pension fund of the city of Seattle denying a disability pension to the relator. It appeared that the relator was confined in an asylum, having become mentally incompetent as the result of a venereal disease. The proceeding was instituted on his behalf by his guardian. The statute provided that the board, in addition to other powers granted, should have authority "`To make all needful rules and regulations for its guidance in conformity with the provisions of this act.'" The board had adopted the following by-law:
"`No relief shall be granted on account of sickness, disability or death of any member resulting from his dissipation, immoral habits or practices.'"
The record before this court disclosed no evidence that the disease from which the relator suffered was the result of "`dissipation, immoral habits or practices.'" The origin of the disease was unknown. This court held that the board had no authority to adopt the by-law above referred to, and affirmed the judgment of the superior court, stating:
"In the present case, the board based its action wholly upon a rule it had no authority to adopt and an unwarranted presumption that the rule had been violated."
Relying upon the Gifford case, respondent argues that, in the case at bar, there was no evidence before the board which would support a finding that Officer Benedict did not suffer death in the line of duty. This argument is based upon a negative. In order to grant respondent's application for a pension, the board was required to find from the evidence before it that her husband was killed while in the performance of his duties as a police officer. Respondent's testimony goes no further than to state her opinion that her husband saw Richard pointing the gun. Dr. Wilson's testimony was to the effect that, in his opinion, Officer Benedict might have seen the boy pointing the revolver. The board had before it the undisputed testimony of Dr. *480 Wilson as to the course of the bullet through Officer Benedict's head.
Respondent cites the case of State ex rel. Schoedinger v. Lentz, 132 Ohio St. 50, 5 N.E. (2d) 167, arguing that the case is on all fours with the case at bar. It appeared that, after finishing his day's duties, an officer of the Cincinnati police force, while at home, started to clean his service revolver, removing four cartridges therefrom, but, through oversight, neglected to remove the fifth. In the course of cleaning his revolver, the remaining cartridge was accidentally discharged, mortally wounding the officer.
After his death, his widow and minor children applied for a pension, which the board of trustees of the police relief fund denied. By an application for a writ of mandate, the widow and children, as relators, sought a writ directing the board to allow them a pension. On appeal from an order granting the writ, the supreme court affirmed the judgment, holding that keeping his service revolver clean was a police duty, to be accomplished by the officer himself, the time and place of the cleaning being immaterial.
The case is not controlling here, as it appeared beyond question that the officer in the case cited suffered a mortal wound in the performance of his duty as a police officer. The question in the case at bar is whether or not the evidence before appellants, as a board, showed that Officer Benedict, at the time he was fatally shot, was engaged in the performance of his duty as a police officer.
[7] The question presented to the board for consideration was one difficult of solution, as stated by a member of the board in his testimony before the superior court. But it cannot be held, as a matter of law, that the decision of the board was arbitrary or capricious or was not based upon evidence introduced before the board and which the board might properly consider in determining the question presented.
If Officer Benedict did see his son standing in the doorway, the court could not find that the officer saw the revolver in his son's hand. Beyond question, the officer's *481 head was not turned toward his son, nor did he make any bodily movement whatsoever. Neither did he utter any word or sound.
In its oral opinion, the trial court stated that the writ should be granted "not that the board acted arbitrarily and capriciously, but that it improperly applied the law to the facts."
By finding of fact No. 3, the trial court found that Officer Benedict "was shot and killed within boundaries of said city while actually engaged in the performance of his duties as such police officer."
By conclusion of law No. 3, the trial court stated that the board "improperly applied the law to the undisputed evidence submitted by the relator," and entered the peremptory writ of mandate from which appellants have appealed.
We hold that the evidence upon which the superior court entered the order appealed from, does not support that order.
The primary and basic duty rested upon the board to determine the question of whether or not Officer Benedict died while in the performance of his police duties. Under the evidence, the only police duty upon which Officer Benedict could have been engaged when he was shot, was an attempt or the initiation of an attempt to disarm his son.
In the light of the applicable principles of law, the superior court would have been justified in reversing the order of the board only if it appeared, beyond reasonable question, that the order was against the clear weight of the evidence. The superior court was sitting as a court of review, not as a court of original jurisdiction.
We are convinced that the action of the board in denying respondent's claim was neither arbitrary nor capricious, and that the question to be determined by the board was a close one which the board might have decided either way, without being considered to have acted either capriciously or arbitrarily.
*482 Respondent also argues that, from the record before the superior court, it appeared that the board had prejudged the question, prior to its meeting at which the evidence was introduced. The record before us does not support this contention.
The order appealed from is reversed, and the cause remanded to the superior court with instructions to deny and dismiss the application for a writ of mandate.
SIMPSON, C.J., SCHWELLENBACH, GRADY, and DONWORTH, JJ., concur.
NOTES
[1] Reported in 214 P. (2d) 171.