[No. 50979-4.   En Banc.   June 12, 1986.]

THE STATE OF WASHINGTON, *Respondent,* v. LAURA J. GUNWALL, *Appellant.*

*Mark W. Muenster* of *Washington Appellate Defender Association,* for appellant.

*Seth R. Dawson, Prosecuting Attorney,* and *Seth Aaron Fine, Deputy,* for respondent.

*Paul J. Lawrence* on behalf of the American Civil Liberties Union, amicus curiae for appellant.

ANDERSEN, J.—

## FACTS OF CASE

At issue in this case is whether police can, without legal process, obtain the records of a telephone subscriber's long distance telephone calls (toll records) and by the use of a pen register also obtain the local telephone numbers the subscriber dials.

In December of 1983, the Snohomish County Prosecuting Attorney charged Laura Gunwall and her brother, Ken Bohan, with delivering, conspiring to deliver and possessing cocaine in violation of the Uniform Controlled Substances

Act, RCW 69.50.401(a). Mr. Bohan has not appealed; therefore, we will herein refer to Ms. Gunwall as the sole defendant.

The defendant moved to suppress all evidence derived from a pen register and from telephone toll records obtained by Everett police officers without any valid legal process. Information from the pen register tapes and toll records was included in the affidavit that supported the warrant issued to search the defendant's house. The trial judge denied the defendant's motion and found her guilty on stipulated facts. The defendant appealed directly to this court. We granted direct review on the basis that her case contained important issues of first impression in this state.[1]

The investigation of the defendant began on July 18, 1983, when an anonymous source told Everett police that she was selling cocaine from her home on Butler Avenue. Another informant described her as a "large quantity cocaine dealer", and said that her telephone number was 339–3698. Soon after receiving this information, the police learned that the defendant's brother had picked up cocaine from one "Mario" at the Everett Pacific Hotel. A detective confirmed that a Mario Alers, with a Florida address, had registered at the hotel on August 14 and 15, 1983.

On August 27, 1983, an undercover police officer met with Janice Mayer and gave Mayer $300 for some cocaine. Other officers followed Mayer as she drove to and from a home at 3010 Butler. Mayer returned to the officer with one–eighth ounce of cocaine.

Later that day, two undercover officers bought an additional one–half ounce of cocaine from Mayer. Police officers again watched her drive to 3010 Butler, enter the house, depart and drive back to the undercover officers with the cocaine. Mayer told the officers that her girl friend cut the cocaine from pound bags. When asked about the possibility of meeting her friend to arrange a larger purchase, Mayer stated, "Laurie doesn't like to meet too many people and I'm one of Laurie's closest friends." The officers bought

---

[1]RAP 4.2.

cocaine from Mayer a third time on September 2, again after Mayer drove to and from 3010 Butler.

On August 29, a detective learned from the phone company that the number 339–3698 was listed to Laura Gunwall of 3010 Butler and asked for phone toll information regarding that number. Toll records for the defendant's phone number revealed several collect calls made to her number from a number listed to Mario Alers of Miami, Florida. The police confirmed Alers' 1982 arrest for possession of cocaine and drug equipment and for carrying a concealed weapon.

On August 31, the detective received a court order authorizing the placement of a pen register on the defendant's phone (the trial court later found that the order was obtained without any evidentiary showing).[2] The detective learned from the pen register tapes that several calls had been placed to airline reservation offices, and also to a Florida phone number listed to one William Navarro. It was then learned that Navarro had been contacted by United States customs agents regarding possible marijuana violations and in 1973 was convicted of mail fraud.

The detective contacted the airlines called from phone number 339–3698 and learned that L. Gunwall had reserved seats on two late–night flights to Miami. Another detective watched the defendant board one of the flights. With the aid of information obtained by use of the pen register, the officers traced the defendant to two or three hotels in Miami. While one detective pursued the telephone information, another detective contacted Janice Mayer by phone to arrange another cocaine purchase. Mayer again referred several times to "Laurie" as her source.

The defendant returned to Seattle on September 21, 1983, and a detective watched Janice Mayer meet her and drive her home. On September 28, Mayer sold an undercover officer one–eighth ounce of cocaine as a sample for a

---

[2]The State does not challenge the defendant's contention that insofar as the defendant's rights are concerned, the court order was thus a "sham". *But cf.* 18 U.S.C. § 2511(2)(a)(ii) exonerating the phone company from liability when information is released pursuant to "court order".

larger purchase. Police surveillance again indicated that Mayer got the cocaine from the defendant's residence. When Mayer produced the one–eighth ounce, the officer asked her if she had seen more cocaine. Mayer reported seeing 7 ounces in a safe and said that she could sell the officer 2 ounces whenever the officer was ready.

On the basis of this information, an Everett District Court judge issued a warrant to search the defendant's residence for cocaine and drug related equipment. The search was conducted on September 28, 1983, during which police seized large quantities of cocaine and cash.

Three basic issues are presented by this appeal.

## ISSUES

ISSUE ONE. When is it appropriate for this court to resort to independent state constitutional grounds to decide a case, rather than deferring to comparable provisions of the United States Constitution as interpreted by the United States Supreme Court?

ISSUE TWO. Did the defendant have a protectable constitutional interest in the telephone numbers she called from her home telephone so as to prohibit the police from obtaining her long distance toll records and placing a pen register on her telephone line without first obtaining proper legal process?

ISSUE THREE. Did the affidavit for a search warrant support a finding of probable cause for the search of the defendant's residence independently of the information derived from the telephone toll records and pen register?

## DECISION

ISSUE ONE.

CONCLUSION. The following nonexclusive neutral criteria are relevant in determining whether, in a given situation, the Washington State Constitution should be considered as extending broader rights to its citizens than the United States Constitution: (1) the textual language; (2) differences in the texts; (3) constitutional history; (4) preexisting state law; (5) structural differences; and (6) matters of particular state or local concern.

A recent law review article summarizes current Washington law regarding independent state constitutional grounds:

Washington is one of many states that rely on their own constitutions to protect civil liberties. Since the recent retrenchment of the United States Supreme Court in this area, the appellate courts of a majority of the states have interpreted their state constitutions to provide greater protection for individual rights than does the United States Constitution.[3]

(Footnotes omitted.) The United States Supreme Court has recognized that the states can do this because each state has the "sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution."[4] This court has stated the rule in similar fashion.[5]

The advocates of this relatively new movement to resort to independent state constitutional grounds tend to talk in terms of it being "increasingly necessary for the States in our federal scheme to assume a role of activism designed to adapt our law and libertarian tradition to changing civilization",[6] and to hail this trend as a triumph of personal lib-

---

[3]Utter, *Freedom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights*, 7 U. Puget Sound L. Rev. 491, 499 (1984). *See State v. Jackson*, 102 Wn.2d 432, 439, 688 P.2d 136 (1984); *State v. Myrick*, 102 Wn.2d 506, 510, 688 P.2d 151 (1984); *State v. Chrisman*, 100 Wn.2d 814, 817, 676 P.2d 419 (1984); *State v. Ringer*, 100 Wn.2d 686, 690, 674 P.2d 1240 (1983); *State v. Rinaldo*, 36 Wn. App. 86, 89, 673 P.2d 614 (1983), *aff'd*, 102 Wn.2d 749, 689 P.2d 392 (1984); *State v. White*, 97 Wn.2d 92, 108, 640 P.2d 1061 (1982); *Alderwood Assocs. v. Washington Envtl. Coun.*, 96 Wn.2d 230, 238, 635 P.2d 108 (1981); *State v. Simpson*, 95 Wn.2d 170, 177, 622 P.2d 1199 (1980); *State v. Fain*, 94 Wn.2d 387, 392, 617 P.2d 720 (1980); *State v. Hehman*, 90 Wn.2d 45, 49, 578 P.2d 527 (1978).

[4]*Pruneyard Shopping Ctr. v. Robins*, 447 U.S. 74, 81, 64 L. Ed. 2d 741, 100 S. Ct. 2035 (1980). *See Oregon v. Hass*, 420 U.S. 714, 719, 43 L. Ed. 2d 570, 95 S. Ct. 1215 (1975); *Cooper v. California*, 386 U.S. 58, 64, 17 L. Ed. 2d 730, 87 S. Ct. 788, *reh'g & modification denied*, 386 U.S. 988, 18 L. Ed. 2d 243, 87 S. Ct. 1283 (1967).

[5]*See White*, at 108 (and cases therein cited).

[6]*The Role of a Bill of Rights in a Modern State Constitution*, 45 Wash. L. Rev. 453 (1970).

erty. On the other hand, those who oppose it talk in terms of "result oriented" judicial decisions, "constitution shopping", courts acting as "superlegislatures" and as an "all sail, no anchor" approach to state constitutional law.[7]

As one commentator observes, "[f]inding instances of state courts' use of state constitutions independently of the Federal Constitution is easier than articulating a principled theory of when courts should in fact use the power they have to chart their own course."[8] Many of the courts now resorting to state constitutions rather than to analogous provisions of the United States Constitution simply announce that their decision is based on the state constitution but do not further explain it. The difficulty with such decisions is that they establish no principled basis for repudiating federal precedent and thus furnish little or no rational basis for counsel to predict the future course of state decisional law.

To us it is self-evident that

a considerable measure of cooperation must exist in a truly effective federalist system. Both federal and state courts share the goal of working for the good of the people to ensure order and freedom under what is publicly perceived as a single system of law. Moreover, while a natural monolithic legal system is not contemplated, some consistency and uniformity between the state and federal governments in certain areas of judicial administration is desirable.

For these reasons, state courts should be sensitive to developments in federal law. Federal precedent in areas addressed by similar provisions in our state constitutions can be meaningful and instructive. We have recently recognized the importance of federal sources of constitutional doctrine. The opinions of the Supreme Court, while not controlling on state courts construing their own

[7]*See* Deukmejian & Thompson, *All Sail and No Anchor—Judicial Review Under the California Constitution,* 6 Hastings Const. L.Q. 975 (1979).

[8]Howard, *State Courts and Constitutional Rights in the Day of the Burger Court,* 62 Va. L. Rev. 873, 934 (1976).

constitutions, are nevertheless important guides on the subjects which they squarely address.[9]

(Citations omitted.)

■ We deem the following six nonexclusive neutral criteria synthesized from a burgeoning body of authority,[10] relevant to determining whether, in a given situation, the constitution of the State of Washington should be considered as extending broader rights to its citizens than does the United States Constitution.

1. *The textual language of the state constitution.* The text of the state constitution may provide cogent grounds for a decision different from that which would be arrived at under the federal constitution. It may be more explicit or it may have no precise federal counterpart at all.

2. *Significant differences in the texts of parallel provisions of the federal and state constitutions.* Such differences may also warrant reliance on the state constitution. Even where parallel provisions of the two constitutions do not have meaningful differences, other relevant provisions of the state constitution may require that the state constitution be interpreted differently.

3. *State constitutional and common law history.* This may reflect an intention to confer greater protection from the state government than the federal constitution affords from the federal government. The history of the adoption of a particular state constitutional provision may reveal an intention that will support reading the provision independently of federal law.

4. *Preexisting state law.* Previously established bodies of state law, including statutory law, may also bear on the granting of distinctive state constitutional rights. State law

---

[9]*State v. Hunt,* 91 N.J. 338, 363, 450 A.2d 952 (1982) (Handler, J., concurring).

[10]*See The Role of a Bill of Rights in a Modern State Constitution,* 45 Wash. L. Rev. 453 (1970); *White,* 97 Wn.2d at 108; Bice, *Anderson and the Adequate State Ground,* 45 S. Cal. L. Rev. 750 (1972); Deukmejian & Thompson, 6 Hastings Const. L.Q. at 975; Utter, 7 U. Puget Sound L. Rev. at 494 (1984).

may be responsive to concerns of its citizens long before they are addressed by analogous constitutional claims. Preexisting law can thus help to define the scope of a constitutional right later established.

5. *Differences in structure between the federal and state constitutions.* The former is a grant of enumerated powers to the federal government, and the latter serves to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives. Hence the explicit affirmation of fundamental rights in our state constitution may be seen as a guaranty of those rights rather than as a restriction on them.

6. *Matters of particular state interest or local concern.* Is the subject matter local in character, or does there appear to be a need for national uniformity?[11] The former may be more appropriately addressed by resorting to the state constitution.

In a recent opinion, we declined to discuss state constitutional grounds because they had not been thoroughly briefed and discussed, stating that "naked castings into the constitutional sea are not sufficient to command judicial consideration and discussion."[12]

Thus, the foregoing six criteria are aimed at: (1) suggesting to counsel where briefing might appropriately be directed in cases wherein they are urging independent state constitutional grounds; and (2) helping to insure that if this court does use independent state constitutional grounds in a given situation, it will consider these criteria to the end that our decision will be made for well founded legal rea-

---

[11]For example, the United States Supreme Court upheld local concerns in *Coyle v. Smith,* 221 U.S. 559, 55 L. Ed. 853, 31 S. Ct. 688 (1911) (each state has the power to locate its own seat of government, to determine when and how it shall be changed from one place to another, and to appropriate its own public funds for that purpose) and *Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 13 L. Ed. 996 (1851) (pilotage does not require uniform national rule).

[12]*In re Rosier,* 105 Wn.2d 606, 616, 717 P.2d 1353 (1986), quoting with approval from *United States v. Phillips,* 433 F.2d 1364, 1366 (8th Cir. 1970), *cert. denied,* 401 U.S. 917, 27 L. Ed. 2d 819, 91 S. Ct. 900 (1971).

sons and not by merely substituting our notion of justice for that of duly elected legislative bodies or the United States Supreme Court. As Professor George R. Nock colorfully expressed it in a privacy context:

> The principles that lie at the core of our protection from wrongful privacy invasions did not spring forth from the brow of an Olympian jurist agonizingly meditating upon constitutional mysteries.[13]

Nor should they. Recourse to our state constitution as an independent source for recognizing and protecting the individual rights of our citizens must spring not from pure intuition, but from a process that is at once articulable, reasonable and reasoned.[14]

ISSUE TWO.

CONCLUSION. The privacy interests of citizens which are protected by article 1, section 7 of the Washington State Constitution prevent the defendant's long distance home telephone records from being obtained from the phone company, or a pen register from being installed on her telephone connections, without a search warrant or other appropriate legal process first being obtained. The trial court erred by not striking the information the police obtained from such sources from the search warrant affidavit.

Telephone toll billing records reflect completed long distance calls, and pen registers are devices which when attached to telephone lines or connections, identify all local and long distance numbers dialed, whether the call is completed or not.[15] For constitutional purposes, we perceive no

---

[13]Nock, *Seizing Opportunity, Searching for Theory: Article I, Section 7*, 8 U. Puget Sound L. Rev. 331, 347–48 (1985).

[14]*See Hunt*, 91 N.J. at 367 (Handler, J., concurring).

[15]Fishman, *Pen Registers and Privacy: Risks, Expectations, and the Nullification of Congressional Intent*, 29 Cath. U. L. Rev. 557, 558 n.3 (1980) states: "A pen register is a mechanical device, usually installed at a central telephone company facility, that records on paper the numbers dialed from a particular telephone by monitoring the electronic impulses caused when the dial is rotated. Such

meaningful difference between the two. "The expectation of privacy [from] a pen register, both subjectively and objectively, is substantially similar to that in toll billing records."[16] Legally, they are in the same mold, therefore, we here consider them together.

In *Smith v. Maryland*, 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979), a frequently criticized 5–to–3 decision,[17] the United States Supreme Court held that the Fourth Amendment did not prohibit the installation of a pen register on a personal telephone line or connection without a warrant or court order. Other federal courts have similarly held that no Fourth Amendment protection is afforded to telephone toll billing records.[18]

## STATE CONSTITUTIONAL ANALYSIS

██ As discussed above, however, these federal rulings are not the end of our inquiry. Applying the six nonexclusive neutral criteria set forth above, we conclude that this is an appropriate case in which to resort to independent state constitutional grounds. Our reasoning, keyed to the above

---

a device reveals only the numbers that have been dialed. It does not enable anyone to hear any of the communications transmitted. Thus, a pen register discloses neither the subject of a communication between the caller and the recipient, their identities, nor whether the call was even completed. A touch–tone decoder accomplishes the same results, with the same limitations, on a touch–tone telephone."

[16]*Hunt*, 91 N.J. at 344.

[17]*See, e.g.*, C. Fishman, *Wiretapping and Eavesdropping* § 28, at 103 (Supp. 1985) ("unrestricted use of pen registers by the police would have a substantial and deleterious effect on privacy"); *People v. Sporleder*, 666 P.2d 135, 141 (Colo. 1983) ("A telephone subscriber . . . has an actual expectation that the dialing of telephone numbers from a home telephone will be free from governmental intrusion."); 1 W. LaFave, *Search and Seizure* § 2.7, at 153–55 (Supp. 1986) (contending that individuals have a legitimate expectation of privacy in telephone records); Note, *Pen Registers After Smith v. Maryland*, Harv. C.R.–C.L. L. Rev. 753 (1980).

[18]*Reporters Comm. v. A.T. & T.*, 593 F.2d 1030 (D.C. Cir. 1978), *cert. denied*, 440 U.S. 949, 59 L. Ed. 2d 639, 99 S. Ct. 1431 (1979); *United States v. Fithian*, 452 F.2d 505 (9th Cir. 1971); *DiPiazza v. United States*, 415 F.2d 99 (6th Cir. 1969), *cert. denied*, 402 U.S. 949, 29 L. Ed. 2d 119, 91 S. Ct. 1606 (1971).

six criteria, is as follows.

1. *The textual language of the state constitution.* Article 1, section 7 of our state constitution provides:

> No person shall be disturbed in his *private affairs,* or his home invaded, *without authority of law.*

(Italics ours.) The provision thus focuses on the protection of a citizen's private affairs. Accordingly, as this court has held, "due to the explicit language of Const. art. 1, § 7, under the Washington Constitution the relevant inquiry for determining when a search has occurred is whether the State unreasonably intruded into the defendant's 'private affairs.'"[19]

2. *Significant differences in the texts of parallel provisions of the federal and state constitutions.* The fourth amendment to the United States Constitution provides as follows:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Thus, the language of the federal constitution is substantially different from that of the parallel provision of our state constitution. This is particularly true in that unlike the federal constitution, our state constitution expressly provides protection for a citizen's "private affairs". In a number of cases, this court has held that this difference in language is material and allows us to render a more expansive interpretation to article 1, section 7.[20]

3. *State constitutional and common law history.* It is unnecessary in this case to discuss our state common law history relative to Const. art. 1, § 7. It suffices to observe

---

[19]*State v. Myrick,* 102 Wn.2d 506, 510, 688 P.2d 151 (1984).

[20]*See State v. Chrisman,* 100 Wn.2d 814, 676 P.2d 419 (1984); *State v. White,* 97 Wn.2d 92, 640 P.2d 1061 (1982); *State v. Simpson,* 95 Wn.2d 170, 622 P.2d 1199 (1980). *See also* Nock, 8 U. Puget Sound L. Rev. at 342.

that in 1889, our State Constitutional Convention specifically rejected a proposal to adopt language identical to that of the Fourth Amendment, before adopting Const. art. 1, § 7 in its present form.[21] This, too, lends support to reading article 1, section 7 independently of federal law in this case.

4. *Preexisting state law.* The State of Washington has a long history of extending strong protections to telephonic and other electronic communications. For example, RCW 9.73.010, which makes it a misdemeanor for anyone to wrongfully obtain knowledge of a telegraphic message, was enacted in 1909 and is based on section 2342 of the Code of 1881. The 1881 Code, adopted before statehood, extensively regulated telegraphic communications. *See* Code of 1881, §§ 2342–62. Our present statute is broad, detailed and extends considerably greater protections to our citizens in this regard than do comparable federal statutes and rulings thereon.[22] We recently discussed this in some detail in *State v. O'Neill*, 103 Wn.2d 853, 700 P.2d 711 (1985); therefore, we need not do so again here. The long history and tradition of strict legislative protection of telephonic and other electronic communications in this state lends strong support to our decision to resort to independent state constitutional grounds in this case.

5. *Differences in structure between the federal and state constitutions.* As this court has often observed, the United States Constitution is a *grant* of limited power authorizing the federal government to exercise only those constitutionally enumerated powers expressly delegated to it by the states, whereas our state constitution imposes *limitations* on the otherwise plenary power of the state to do anything not expressly forbidden by the state constitution or federal law.[23] This also supports construing article 1, section 7 of

---

[21]*Journal of the Washington Constitutional Convention, 1889,* at 497 (B. Rosenow ed. 1962). *See* Nock, 8 U. Puget Sound L. Rev. at 332.

[22]*See* RCW 9.73.

[23]*See Fain v. Chapman*, 89 Wn.2d 48, 53, 569 P.2d 1135 (1977); Utter, *Free-*

our state constitution so as to guarantee protection of the defendant's privacy rights in the context presented here.

6. *Matters of particular state interest or local concern.* In the case before us, this topic overlaps criterion 4, and to that extent the above discussion of criterion 4 also pertains here. The objective of national uniformity of rules regarding the availability of telephone records and the use of pen registers, important as that may be, is outweighed in this case by overwhelming state policy considerations to the contrary.

Having concluded on the basis of the foregoing analysis that we may appropriately resort to separate and independent state grounds of decision in this case,[24] we now proceed to do so.

We agree with the reasoning of the Colorado Supreme Court in another recent independent state constitutional grounds case:

> A telephone subscriber . . . has an actual expectation that the dialing of telephone numbers from a home telephone will be free from governmental intrusion. A telephone is a necessary component of modern life. It is a personal and business necessity indispensable to one's ability to effectively communicate in today's complex society. When a telephone call is made, it is as if two people are having a conversation in the privacy of the home or office, locations entitled to protection under . . . the Colorado Constitution. The concomitant disclosure to the telephone company, for internal business purposes, of the numbers dialed by the telephone subscriber does not alter the caller's expectation of privacy and transpose it into an assumed risk of disclosure to the government.

*People v. Sporleder,* 666 P.2d 135, 141 (Colo. 1983).

We likewise agree with the following from a recent decision of the New Jersey Supreme Court in another indepen-

---

*dom and Diversity in a Federal System: Perspectives on State Constitutions and the Washington Declaration of Rights,* 7 U. Puget Sound L. Rev. 491, 494 (1984).

[24]*See Michigan v. Long,* 463 U.S. 1032, 1041, 77 L. Ed. 2d 1201, 103 S. Ct. 3469 (1983).

dent state constitutional grounds case involving the seizure of telephone company records:

> Allowing such seizures without warrants can pose significant dangers to political liberty. Chief Judge J. Skelly Wright, dissenting in *Reporters Committee v. American Telephone & Telegraph Co.*, 593 F.2d [1030] at 1079, [(D.C. Cir. 1978)] detailed some actual abuses that have occurred. For example, in response to a Jack Anderson column embarrassing to former Vice President Agnew, the FBI secured Anderson's toll billing records. An Anderson source lost his job as a city attorney because his telephone number appeared on Anderson's billing record. See *id.* at 1090–91 & n.27.
>
> It is unrealistic to say that the cloak of privacy has been shed because the telephone company and some of its employees are aware of this information. Telephone calls cannot be made except through the telephone company's property and without payment to it for the service. This disclosure has been necessitated because of the nature of the instrumentality, but more significantly the disclosure has been made for a limited business purpose and not for release to other persons for other reasons.

*State v. Hunt*, 91 N.J. 338, 347, 450 A.2d 952 (1982).

Based on the foregoing, we conclude that when the police obtained the defendant's long distance telephone toll records, and when they placed a pen register on her telephone line or connections, all without benefit of the issuance of any valid legal process, they unreasonably intruded into her private affairs without authority of law and in violation of Washington Const. art. 1, § 7.[25]

In order to avoid unnecessary confusion as to where this decision leaves Washington law on this subject, we further hold as follows in this regard.

Generally speaking, the "authority of law" required by Const. art. 1, § 7 in order to obtain records includes authority granted by a valid, (*i.e.,* constitutional) statute,

---

[25]See *State v. Myrick*, 102 Wn.2d 506, 510–13, 688 P.2d 151 (1984).

the common law or a rule of this court.[26] In the case of long distance toll records, "authority of law" includes legal process such as a search warrant or subpoena.[27]

The use of a pen register, however, poses a different situation than do toll records. The pen register is comparable in impact to electronic eavesdropping devices in that it is continuing in nature, may affect other persons and can involve multiple invasions of privacy as distinguished from obtaining documents in a single routine search using a conventional search warrant.[28] We conclude that a pen register intercept comes within the definition of a "private communication transmitted by telephone",[29] therefore, it may only be installed pursuant to the stricter requirements of our state statutes controlling electronic eavesdropping.[30] Since "no consent" intercepts of this kind require a valid court order, and can only be authorized by the courts in cases involving national security, danger to human life or in the face of imminent arson or riot,[31] legislative action may be required before a pen register can be authorized to intercept telephonic information concerning illegal drug transactions.

To the extent that our decision in *Bixler v. Hille,* 80 Wn.2d 668, 497 P.2d 594 (1972) ruled that a pen register device does *not* intercept a telephonic communication (such

---

[26]*See State v. Fields,* 85 Wn.2d 126, 530 P.2d 284 (1975); Nock, *Seizing Opportunity, Searching for Theory: Article I, Section 7,* 8 U. Puget Sound L. Rev. 331, 347 (1985).

[27]*See State v. Fields, supra; State v. Hunt,* 91 N.J. 338, 348, 450 A.2d 952 (1982).

[28]*See State v. O'Neill,* 103 Wn.2d 853, 874–75, 700 P.2d 711 (1985).

[29]RCW 9.73.030(1)(a).

[30]RCW 9.73.030–.140. *See State v. O'Neill, supra.*

[31]RCW 9.73.040(1). *See O'Neill,* at 861–67.

interceptions being prohibited by a predecessor to our present electronic eavesdropping statute), it is overruled. We observe that the present electronic eavesdropping statute expressly permits the recording of anonymous and harassing phone calls (such as that case dealt with) with the recipient's consent.[32]

We further note that pursuant to RCW 9.73.060, a party may sue for damages because of an unlawful intercept. The award of damages would be unfair in this case because the use of a pen register has not heretofore been considered to be an intercept of telephonic communications under Washington law,[33] and because no court order was required to install a pen register under a ruling of the United States Supreme Court.[34] Accordingly, our holding herein is prospective only.[35]

ISSUE THREE.

CONCLUSION. Even without the information derived from the telephone toll records and pen register tapes, the affidavit for the search warrant established probable cause for issuance of the warrant used to search the defendant's house. The trial court did not err, therefore, when it refused to suppress the narcotics and other evidence obtained in the search.

When an informant's tip provides the impetus for a police search in this state, the affidavit of probable cause that supports the issuance of the search warrant must set forth facts that establish the informant's basis of knowledge and veracity.[36] The basis of knowledge prong requires the affidavit to recite the manner in which the informant

---

[32]RCW 9.73.030(2).

[33]*Bixler v. Hille,* 80 Wn.2d 668, 497 P.2d 594 (1972).

[34]*Smith v. Maryland,* 442 U.S. 735, 61 L. Ed. 2d 220, 99 S. Ct. 2577 (1979).

[35]*See State v. Hunt,* 91 N.J. at 348–49; *Cascade Sec. Bank v. Butler,* 88 Wn.2d 777, 784–85, 567 P.2d 631 (1977).

[36]*State v. Jackson,* 102 Wn.2d 432, 433, 688 P.2d 136 (1984).

gathered his information.[37] Under the veracity prong, the issue is whether some underlying circumstances are given from which a magistrate could conclude that the informant was credible or the informant's information reliable.[38]

Once the telephone numbers and related information are removed from the affidavit in the present case, most of the remaining information comes from Janice Mayer. Mayer sold cocaine to an undercover police officer that she allegedly got from the defendant on four separate occasions. While Mayer did not know that she was dealing with a police officer, her position is analogous to that of an informant. The defendant concedes that the affidavit contains facts sufficient to establish Mayer's basis of knowledge, but challenges the ability of the remaining information to establish Mayer's veracity.

Janice Mayer was not searched before any of the cocaine sales, but her frequent and direct dealings with an undercover police officer add credibility to her statements that she got the cocaine from "Laurie" who lived at 3010 Butler Avenue.

The facts of this case bear many similarities to those in *State v. Maffeo,* 31 Wn. App. 198, 642 P.2d 404 (1982). In *Maffeo,* police were in direct contact with two men who allegedly bought cocaine from Maffeo. Viewing the two (Martin and Robinson) as informants, the court found their statements "surrounded by indicia of reliability".[39]

> First, their statements that they obtained cocaine from the defendant were admissions against their penal interest. These statements were made without knowledge that Reese was a police officer; thus, it is unlikely that they had any motive for lying. Further, the statements were corroborated by police observations of Robinson proceeding directly to the defendant's residence after a short

---

[37]*State v. Lair,* 95 Wn.2d 706, 709, 630 P.2d 427 (1981); *State v. Smith,* 28 Wn. App. 387, 391, 624 P.2d 191 (1981).

[38]*Lair,* at 709; *Smith,* at 392.

[39]*State v. Maffeo,* 31 Wn. App. 198, 201, 642 P.2d 404 (1982).

conference with Martin, then returning directly to the rendezvous point with the sample of cocaine. Finally, police observed Robinson drive back to Maffeo's house apparently with the marked money in his possession ostensibly to obtain additional cocaine.

(Citations omitted.) *Maffeo,* at 201–02.

The affidavit for a search warrant in this case reveals that the police watched Mayer go to and from the defendant's house several times with the undercover officer's money "ostensibly to obtain additional cocaine". Mayer's actions and statements in getting the cocaine were declarations against her penal interest and were made without knowing that the person she was selling cocaine to was a police officer. Under the *Maffeo* test, the affidavit satisfies the credibility test.

In *State v. Lair,* 95 Wn.2d 706, 710–11, 630 P.2d 427 (1981), this court confirmed that admissions of criminal activity made to a private individual may support an inference of reliability. The court there found "respectable authority" for the view that an admission against penal interest to a private individual is trustworthy:

> Indeed, as a general proposition there is more reason to rely upon such admissions than admissions made directly to police, for in the latter situation there is always the chance that the informer is a stoolie who perceives he can admit to criminality without significant risk.[40]

Janice Mayer had no reason to view the undercover officers as anyone other than private citizens when she arranged the four cocaine sales. Mayer made several statements against her penal interest with no motive to lie. Such statements were sufficient to establish her credibility.[41]

Even without the telephone–related information, therefore, the affidavit supported the finding of probable cause

---

[40]*Lair,* at 711, quoting with approval from 1 W. LaFave, *Search and Seizure* § 3.3, at 530 (1978).

[41]*See Jackson,* at 437; *Maffeo,* at 201.

required for the issuance of a valid search warrant. Mayer sold cocaine four times immediately after emerging from the defendant's house, and several times referred to her supplier as "Laurie". Reasonableness is a key ingredient in the test for issuance of a search warrant.[42] "Good reason for the issuance of a search warrant does not necessarily mean proof of criminal activity but merely probable cause to believe it may have occurred."[43]

Affirmed.

DOLLIVER, C.J., and UTTER, BRACHTENBACH, DORE, PEARSON, CALLOW, GOODLOE, and DURHAM, JJ., concur.

Reconsideration denied August 15, 1986.

---

[42]*State v. Patterson,* 83 Wn.2d 49, 52, 515 P.2d 496 (1973).

[43]*Patterson,* at 52; *State v. Higby,* 26 Wn. App. 457, 613 P.2d 1192 (1980).