[No. 36558-4-I.   Division One.   October 14, 1996.]

THE STATE OF WASHINGTON, *Appellant*, v. RONALD E. WHITE, *Respondent*.

*David S. McEachran, Prosecuting Attorney*, and *Laura D. Hayes* and *David M. Grant, Deputies*, for appellant.

*Starck M. Follis*, for respondent.

*Leo E. Poort* on behalf of Washington Association of Sheriffs and Police Chiefs, amicus curiae.

AGID, J. — Under the inventory search exception to the warrant requirement, the police may search an impounded vehicle to secure valuables and to protect the police department from false claims of theft. Under Washington law, absent a manifest necessity, the police generally may not search the vehicle's trunk if it is locked because the risk of theft to items in a locked trunk is remote. In this appeal we must decide whether the police exceeded the scope of an otherwise lawful inventory search of Ronald White's car when they opened his trunk using an automatic release button in the car's passenger compartment. We conclude that, when a trunk can be opened from an accessible area of a car's passenger compartment, the risk that property in the trunk will be stolen becomes substantial. The police, therefore, did not exceed the permissible scope of the inventory search when they opened White's trunk and searched its contents. Accordingly, we reverse

the trial court's suppression of the evidence found in White's trunk and remand for trial.

## FACTS

In October 1994, Bellingham Police Officer Don Klein pulled Ron White over for running a stop sign. Before Klein stopped White, he reported the car's license plate number to dispatch and learned that the car was registered to a Ms. Whitsett of Sparks, Nevada. White identified himself as Daniel White and gave Klein a date of birth and address. Klein asked White who owned the car. White told him it belonged to his friend Bob Crawson, but that he did not think the registration papers were in the car. Klein asked White to look in the glove compartment anyway. While he was looking, Klein noticed a wallet and asked White whose it was. White said it was his, and Klein asked him to look inside it for his identification. When White opened the wallet, Klein saw a white folded piece of paper. Klein asked him what is was. White told him it was the car's title and handed it to him. The title showed that the car belonged to Whitsett and that she had transferred the title to a Ron White. Klein again questioned White about the car's ownership, and White told him Ron White was his brother in Alaska.

Klein went back to his patrol car and ran a records check on "Daniel L. White," the name White gave him. Klein learned that Daniel White's driver's license had expired the month before and wrote a citation for driving without a valid operator's license. Klein then asked White if he could search the car. White refused, and Klein told him he was going to give him a citation and impound the car. After hearing this, White admitted he was really Ron White, not Daniel White. Klein asked him why he hadn't told him his real name in the first place, and White said he lied because he had several outstanding warrants. Klein ran a records check using White's real name and found out his driver's license had been revoked and that he had six outstanding warrants for failing to appear in

court. Klein arrested White, put him in the patrol car and asked dispatch to send a tow truck for the car.

Another officer arrived to assist Klein. They searched the passenger compartment of White's car, including the unlocked glove compartment. There they found several spoons covered with white residue and a glass tube with burned vegetable matter in it. They also saw an automatic trunk release button in the glove compartment, which they pushed to open the trunk. Klein found a fishing tackle box in the trunk, containing drug paraphernalia, green vegetable matter and packets of vacuum-sealed U.S. currency totaling $5,400. In one of the packets, Klein noticed a solid white item about the size of a golf ball, which turned out to be over 20 grams of cocaine. At White's suppression hearing, Klein testified that the police department's inventory policy requires officers to inventory all accessible areas of the car, including the trunk, and to open any unlocked containers.

The State charged White with unlawful possession of a controlled substance with intent to deliver in violation of RCW 69.50.401(a)(1) and driving while his license was suspended or revoked in violation of RCW 46.20.342. White moved to suppress the items Klein found in his trunk. He stipulated that he was lawfully stopped and that Klein had authority to impound his car. He argued only that the police exceeded the scope of the otherwise lawful inventory search when they opened his locked trunk and examined its contents. The trial court agreed and suppressed the evidence Klein discovered in the tackle box. The State appeals.

## DISCUSSION

■ Under RCW 46.20.435(1), a law enforcement officer may impound a vehicle upon determining that the driver does not have a valid driver's license or is driving with a

suspended or revoked license.[1] After lawfully impounding a vehicle, the inventory exception to the warrant requirement permits an officer to conduct a warrantless search of the car. *State v. Houser,* 95 Wn.2d 143, 153, 622 P.2d 1218 (1980). *See also Colorado v. Bertine,* 479 U.S. 367, 107 S. Ct. 738, 741, 93 L. Ed. 2d 739 (1987) (inventory searches are a well-defined exception to the warrant requirement). A routine search of a lawfully impounded vehicle is reasonable under the Fourth Amendment when the officer follows standard police practice and the search is not a pretext for an evidentiary search. *South Dakota v. Opperman,* 428 U.S. 364, 96 S. Ct. 3092, 3100, 49 L. Ed. 2d 1000 (1976).

The trial court held that White's car was lawfully impounded and that the officers conducted the inventory search in good faith. For the first time on appeal, White contends the police lacked authority to impound his car and assigns error to the court's conclusion that the impound was proper. Under RAP 2.5(a), we may decline to review any claim of error that was not raised in the trial court. An appellant may, however, raise for the first time on appeal a "manifest error affecting a constitutional right." RAP 2.5(a)(3). White contends he can challenge the impound for the first time on appeal because it involves a constitutional issue. To invoke this exception, an appellant must allege more than the existence of a constitutional issue. Rather, he or she must show there was a *manifest error* affecting a constitutional right. *See State v. Lynn,* 67 Wn. App. 339, 342, 835 P.2d 251 (1992) (observing that criminal law "is so largely constitutionalized that most claimed errors can be phrased in constitutional terms"). Without citation to RAP 2.5, White makes only a cursory argument that this issue is properly before us. He

---

[1] Our courts have held that RCW 46.20.435(1) alone is insufficient to justify an impound. Under Washington law, the police may not impound a vehicle if they have reasonable alternatives, such as leaving the car parked or arranging for someone else to pick it up. *State v. Houser,* 95 Wn.2d 143, 153, 622 P.2d 1218 (1980); *State v. Reynoso,* 41 Wn. App. 113, 118, 702 P.2d 1222 (1985). White did not raise this issue in the trial court.

has not established that the alleged error was manifest or otherwise given us grounds to review this issue.

■■ Furthermore, even assuming White had properly raised and argued this issue under RAP 2.5(a)(3), we would decline to review this portion of the court's judgment. The defense clearly waived any issue involving the legality of the impound at the suppression hearing when it stated: "Let's start with the assumption that the impound is totally proper here. Frankly, I don't have any big quarrel with the argument that [the prosecutor] is going to give, because the statute gives them the right to impound his vehicle; I haven't argued that."[2] A defendant may waive even issues of constitutional magnitude, and a "conscious decision not to raise a constitutional issue at trial effectively serves as an affirmative waiver." *State v. Walton*, 76 Wn. App. 364, 370, 884 P.2d 1348 (1994), *review denied*, 126 Wn.2d 1024 (1995). Because White waived any challenge to the lawfulness of the impound, we address only the issue considered by the trial court: whether the officers exceeded the proper scope of the otherwise lawful impound search when they opened his trunk.

■ The trial court concluded that the evidence seized from White's trunk had to be suppressed under *State v. Stroud*, 106 Wn.2d 144, 152, 720 P.2d 436 (1986), and *State v. Houser*, 95 Wn.2d 143, 155-56, 622 P.2d 1218 (1980). As a threshold matter, we disagree that *Stroud* applies here. *Stroud* limits the scope of a vehicle search *incident to arrest* to the passenger compartment. But the exception to the warrant requirement allowing searches incident to arrest is not at issue in this case. As the Supreme Court recently cautioned, courts must keep in mind the distinction between investigatory searches, such as those incident to arrest which are based on probable cause to suspect criminal activity, and inventory searches, which are based on concerns other than a suspicion of criminal activity. *State v. Hendrickson*, 129 Wn.2d 61, 74, 917 P.2d 563 (1996).

---

[2]Verbatim report of proceedings at 63.

■ A warrantless search of a vehicle's passenger compartment incident to arrest is permissible to protect law enforcement officers because the vehicle "may harbor weapons for an occupant" and because an occupant could easily destroy evidence in the vehicle while the police seek a warrant. *Hendrickson*, 129 Wn.2d at 73. Once these dangers are no longer present, the justification for a warrantless search of a vehicle incident to arrest dissipates and the police are required to seek a warrant. *See Hendrickson*, 129 Wn.2d at 73 n.2. In contrast, the purpose of a vehicle inventory search is to secure any property in it and to protect police departments and its bailees from dishonest claims of theft. *See Houser*, 95 Wn.2d at 154. Unlike the grounds for a search incident to arrest, the justification for an inventory search does not fade once the vehicle is removed from the scene. If anything, it increases because an impounded vehicle may be removed to a less secure, unattended location, such as an impound lot, thus increasing the opportunity for and possibility of theft. For these reasons, *State v. Mitzlaff*, 80 Wn. App. 184, 907 P.2d 328 (1995), *review denied*, 129 Wn.2d 1015 (1996), does not inform our inquiry in this case. There, the court refused to extend the permissible scope of a vehicle search incident to arrest to include an engine compartment that could be opened with a release lever in the passenger compartment. Because that case did not involve an inventory search, its analysis does not apply here. *See Hendrickson*, 129 Wn.2d at 74.

Therefore, we look solely to *State v. Houser*, 95 Wn. 2d 143, and other cases governing inventory searches of vehicles to determine the permissible scope of those searches. In *Houser*, the court noted that it had "long held that a non-investigatory inventory search of an automobile is proper when conducted in good faith" to find, list and secure property belonging to a detained person from loss during his or her detention and to protect the police and temporary storage bailees from liability due to dishonest claims of theft. 95 Wn.2d at 154. Concerned that allowing the police to conduct warrantless searches of vehicles could lead to

abuse, the Houser court limited the scope of inventory searches "to those areas necessary to fulfill its purpose." 95 Wn.2d at 155. Because the justification for permitting a warrantless inventory search of a vehicle is to guard against theft and false theft claims, the court held that the scope of the search "should be limited to protecting against substantial risks to property in the vehicle" and not be justified on the basis of remote risks. 95 Wn.2d at 155.

The police opened Houser's trunk with a key as part of their inventory search of his car. The court held that this exceeded the scope of the inventory search exception to the warrant requirement. It reasoned that permitting police to open a locked trunk to inventory its contents does not implicate the valid purposes of an inventory search because items locked in a trunk are not in great danger of theft:

> property locked in the trunk of an automobile . . . presents no great danger of theft. It is apparent that a would-be thief would be unaware of the existence of property of value in the trunk. Indeed, countless numbers of automobiles with locked trunks are daily left on the city streets of this country without unreasonable risk of theft. Accordingly, we think that any need to protect property located in a locked trunk is outweighed by the countervailing privacy interests of the individual in the enclosed area of the trunk.

95 Wn.2d at 155-56. Houser did not establish an absolute prohibition on searching a vehicle's trunk during an inventory search. Rather, it held that "an officer may not examine the locked trunk of an impounded vehicle in the course of an inventory search absent a manifest necessity for conducting such a search." 95 Wn.2d at 156. The State has not argued that the search of White's trunk was justified by a manifest necessity, nor did the trial court find that one existed. Thus, we must decide whether the police exceeded the scope of the inventory search exception to the warrant requirement when they opened White's trunk with the automatic release button and searched its contents.

██ The parties framed this issue in terms of whether a trunk that can be opened from the passenger compartment is "locked" or "unlocked" for the purposes of *Houser*. We decline to resolve this issue on semantics because it is clear that the focus of the *Houser* court's reasoning was not whether the trunk was locked, but whether the potential for theft and false claims against the police department justified the intrusion into the defendant's expectation of privacy in his car trunk. Under *Houser*, the question of whether these risks are substantial or remote must guide our analysis. The risk of theft or unfounded claims becomes substantial when a car's trunk can be opened from an easily-accessible area of the passenger compartment. Implicit in the justification for warrantless inventory searches of the passenger compartment, including its unlocked glove compartment, is the recognition that these are areas a would-be thief can easily get into. Logically, if a thief can get into the passenger compartment of a vehicle, he or she can get into the trunk just as easily if it can be opened with a release button located in that same passenger compartment. Because it is no great secret that some cars have trunk release levers in the glove compartment or by the driver's seat, the danger of theft of items left in the trunks of those cars is far greater than is the case if a car trunk can only be opened with a key.[3] Thus, the policy concerns the *Houser* court relied on, together with logic and common sense, lead us to conclude that this danger of theft outweighed White's reasonable expectation of privacy in the contents of his trunk. The police, therefore, did not exceed the proper scope of the inventory search when they opened his trunk with the release button and inventoried the items in it.

Although *Houser* could be read to establish a bright-line

[3]For these reasons, the analysis might well be different if the officers found a trunk key in the car or unlocked glove compartment and there were no trunk release lever inside the car. The key could be secured separately from the car, thereby reducing the possibility of theft to the rather unlikely level presented to the Houser court. That a key was found in White's car after the search was completed does not change our analysis because there was also a trunk release lever in the unlocked glove compartment.

rule prohibiting the police from searching the interior of a locked trunk regardless of its accessibility to a would-be thief, we decline to read it this way because applying a bright-line rule in this case would frustrate the purposes of the inventory search exception to the warrant requirement. In our view, the Bellingham Police Department would have been hard-pressed to explain to White what happened to the $5,400 he had in his trunk had it turned up missing. As Bellingham Officer Richard Nolte explained at the suppression hearing, the police department has had claims filed against it because of break-ins at the impound lot it uses. He observed that, if the police had not inventoried the contents of White's trunk, he or the rightful owner of the property could have "come back [to the officer who impounded the car] and say, . . . 'There was $5,000 in the vehicle. Where it is now?' "[4]

Focusing on the accessibility of items in the trunk rather than whether or not it was locked is consistent with *South Dakota v. Opperman*, 428 U.S. 364, the leading U.S. Supreme Court case on this issue. There, the court rejected the argument that the scope of a vehicle inventory search should be limited to items in plain view and focused on the accessibility of the area inventoried. *Opperman* upheld a warrantless search of an unlocked glove compartment because it was an area that "vandals would have had ready and unobstructed access [to] once inside the car." 96 S. Ct. at 3100 n.10.

In this respect we question the *Houser* court's reliance on the observation that allowing the police to search trunks is not necessary to effect the purpose of an inventory search because "[i]t is apparent that a would-be thief would be unaware of the existence of property of value in the trunk." 95 Wn.2d at 155-56. That people commonly carry valuables in their trunks is demonstrated by this case. White had over $5,000 cash in his trunk when he was stopped. We are also aware of numerous criminal cases where items of value are discovered in vehicle

---

[4]Verbatim report of proceedings at 45.

trunks. We have trouble understanding the relevance of the *Houser* court's observation that "countless numbers of automobiles with locked trunks are daily left on the city streets of this country without unreasonable risk of theft" to the situation where a car is impounded after its driver is arrested in transit. 95 Wn.2d at 156. Because a person drives around with valuables in his trunk does not necessarily mean he would leave them there after he parked. As Justice Powell observed in *Opperman*, people may leave valuables in their car temporarily that they would not leave there for longer periods of time:

> It is argued that an inventory is not necessary since locked doors and rolled-up windows afford the same protection that the contents of a parked automobile normally enjoy. But many owners might leave valuables in their automobile temporarily that they would not leave there unattended for the several days that police custody may last.

96 S. Ct. at 3102 (Powell, J., concurring; footnote omitted).

Amicus curiae, the Washington Association of Sheriffs and Police Chiefs, argues that *Houser* is no longer good law because it was decided solely under Fourth Amendment principles that have been overruled by subsequent federal case law. It also contends that *Houser's* requirement that the police demonstrate a manifest necessity before opening a locked trunk is based on a misreading of federal law because the Fourth Amendment imposes no such requirement. In response, White asserts that art. 1, § 7 of the state constitution affords him greater protection from the type of search involved here. Regardless of the merits of these arguments, we are not persuaded that the *Houser* court decided this issue exclusively under the Fourth Amendment. It noted that *South Dakota v. Opperman*, 428 U.S. 364, recognized two additional justifications for inventory searches besides protecting items from theft and guarding against false claims of theft. These are to protect police officers from potential danger and the public from vandals who might find a firearm or contraband

drugs in the car. But the *Houser* court expressly declined to follow this portion of *Opperman*, stating that, without more, "these purposes will not serve to justify an inventory search in each and every case." 95 Wn.2d at 154 n.2. The *Houser* court's decision not to adopt all of *Opperman's* reasoning indicates that it was not deciding the case solely on federal constitutional grounds.

Nor do we think the *Houser* court's failure to address the independent state constitutional analysis required by *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4th 517 (1986), indicates an intent not to decide the case on state constitutional grounds, as the Association suggests. That the *Houser* court did not mention *Gunwall* is fairly unremarkable, considering it wouldn't decide that case for another 6 years. In any event, our resolution of this case does not require us to determine whether the manifest necessity requirement in *Houser* has survived recent developments in federal law.

The State argues that we are not bound by the portion of *Houser* that establishes the manifest necessity requirement because it is dicta. As with the federal law issue, we need not resolve this one either. We do agree that the *Houser* court's discussion of the scope of an inventory search was not necessary to its disposition of the case because it had already concluded that the impound was unlawful. *See* 95 Wn.2d at 160 (Justice Doran dissenting). But, even though the court did not need to reach this issue, it clearly intended to establish the manifest necessity rule as a holding. So, to the State's invitation to ignore this portion of the case as dicta, we respond that not all dicta is created equal, and this is not the sort of dicta we are inclined to ignore.

Reversed and remanded.

COLEMAN, J., concurs.

Becker, J. (dissenting) — I respectfully dissent. My text consists of the following statements by the Washington Supreme Court:

We therefore hold that an officer may not examine the locked trunk of an impounded vehicle in the course of an inventory search absent a manifest necessity for conducting such a search.[5]

And:

[O]nce this court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by this court.[6]

In the present case, the officers examined the locked trunk of an impounded vehicle in the course of an inventory search, without showing a manifest necessity for doing so. Therefore, as the trial court properly held, *Houser* requires suppression. This court is without authority to hold otherwise.

The majority undertakes to avoid *Houser* by reading out of it the words "locked trunk": "We decline to resolve this issue on semantics because it is clear that the focus of the *Houser* court's reasoning was not whether the trunk was locked, but whether the potential for theft and false claims against the police department justified the intrusion into the defendant's expectation of privacy in his car trunk." Majority, at 779. The majority agrees that the manifest necessity requirement is not dicta and that lower courts are bound by it. Majority, at 782. Yet, by eliminating the focus on the locked trunk, the majority also reads out of *Houser* the manifest necessity requirement. Because *Houser* establishes manifest necessity as the precondition for searching a locked trunk, the undisputed fact of the locked trunk is an unavoidable part of our analysis. If it were unimportant, trial courts would never need to find a manifest necessity. Instead they would need only to perform their own balancing test.

Because an inventory search of an impounded automobile may occur in the absence of criminally suspicious

---

[5]*State v. Houser*, 95 Wn.2d 143, 156, 622 P.2d 1218 (1980).

[6]*State v. Gore*, 101 Wn.2d 481, 487, 681 P.2d 227 (1984).

conduct, the rules controlling such searches directly impact many citizens. This State's highest court decided in *Houser* that the constitutionally based privacy interest of the citizen outweighed the government's reasons for inspecting and cataloguing private property located in the locked trunks of impounded cars.[7] The Court did not invite the lower courts to reweigh those interests, and until today the lower courts have not done so.

Debate as to the proper scope of inventory searches has been extensive and vigorous.[8] The majority of state supreme courts have conformed their holdings to the Fourth Amendment as interpreted by the United States Supreme Court. Others, like the Washington State Supreme Court, have taken positions that are more protective of individual privacy, relying on their own state constitutions.[9] The two dissenters in *Houser* raised the counterpoints and what-ifs typical of this debate, emphasizing the risks of theft and false claims in terms almost identical to this court's opinion today. The *Houser* majority, concerned about the "possibility for abuse" inherent in unlimited inventory searches,[10] simply disagreed that these concerns were of sufficient magnitude to overcome the privacy interest manifested by the individual's decision to lock the trunk.[11]

The police in the present case followed a standard impound procedure, one that has been in effect for 20 years. The procedure directs the police to search a trunk whenever they can gain access by means of a key or a trunk release. The procedure therefore requires the very

---

[7]*Houser*, 95 Wn.2d at 156.

[8]*See generally* Emile F. Short, Annotation, *Lawfulness of "Inventory Search" of Motor Vehicle Impounded by Police*, 48 A.L.R.3D 537 (1973 & Supp. 1996).

[9]*See State v. Boland*, 115 Wn.2d 571, 578, 800 P.2d 1112 (citing *Houser* as example of a holding under WASH. CONST. art. I, § 7).

[10]*Houser*, 95 Wn.2d at 155.

[11]*Houser*, 95 Wn.2d at 155-56; and at 155 n.3 (noting skepticism that inventories are an effective means of discouraging false claims).

search that *Houser* prohibits.[12] Either this standard procedure needs to be revised, or *Houser* does. Implicitly, the majority suggests it is *Houser* that is unsatisfactory. Even if that were so, the decision to revise its own clear holding belongs to the Supreme Court. This court's effort to distinguish *Houser* is a form of tinkering that will produce uneven results by creating two classes of privacy interests, one for drivers who have a trunk release button, and one for those who do not. The police will have to evaluate the quality of the trunk lock and the location of its release every time they impound a vehicle. In comparison, *Houser* is a simple, comprehensive and workable decision. In my view it lacks neither in logic nor common sense.

*Houser's* prohibition against searching locked trunks absent manifest necessity is enforced by the Ninth Circuit, which recognizes that holding as the established law of this state. *United States v. Johnson*, 936 F.2d 1082 (9th Cir. 1991). We, too, are bound by *Houser* and our duty is to enforce it. The State did not attempt, either at the trial court or the appellate court, to establish a manifest necessity for examining the locked trunk. For our purposes that ends the inquiry.

I would affirm the superior court's suppression order.

Reconsideration denied November 22, 1996.

Review granted at 131 Wn.2d 1020 (1997).

---

[12]The police opened Houser's locked trunk with a key obtained from the defendant. *Houser*, 95 Wn.2d at 147.