20 P.3d 907 (2001)
143 Wash.2d 384
In the Matter of the Personal Restraint of Richard J. DYER, Petitioner.
No. 67673-9.
Supreme Court of Washington, En Banc.
Argued October 17, 2000.
Decided March 29, 2001.
*908 Leta Jeanne Schattauer, Suzanne Lee Elliott, Seattle, Amicus Curiae on behalf of Washington Ass'n of Criminal.
Ryan, Sells, Uptegraft & Decker, David P. Horton, Silverdale, for Petitioner.
Christine Gregoire, Attorney General, Martin E. Wyckoff, Asst. Atty. Gen., Tacoma; Carol A. Murphy, Asst. Atty. Gen., Olympia.
IRELAND, J.
This Court granted review of a Court of Appeals' decision that dismissed Richard J. Dyer's personal restraint petition, in which he claimed he had a right to extended family visits. We find the Court of Appeals properly determined that extended family visits are *909 not a liberty interest and that the Department of Corrections did not act arbitrarily or capriciously in following the Division of Prisons Directive. We affirm.

FACTS
Richard J. Dyer, an inmate at Airway Heights Corrections Center (Airway Heights) since 1982, is serving a life sentence for the first degree rapes of two women: Ms. A in January 1980, and Ms. B in August 1980. A jury also convicted him of rape, burglary, and unlawful imprisonment charges involving his second wife, Ethel Acord. On appeal, the Court of Appeals, Division Two, reversed.[1] However, Ms. Acord's sworn testimony was admitted during trial on the two rapes for which Dyer was convicted. State v. Dyer, No. 06162-7-II, 38 Wash.App. 1045 (Wash.Ct.App. Aug. 14, 1984).
Dyer has been married three times: to Janet Cutting from 1967 to 1972; to Ethel Acord from 1978 to 1981; and to his current wife, Rennetta, since 1981. In January 1972, Dyer's first wife sought and received a restraining order against Dyer. In her motion and affidavit for the restraining order, Ms. Cutting provided a sworn statement that her husband "had been physically violent towards her," and she was fearful that if he were not restrained, he would cause her bodily harm.[2]
In October 1980, Ms. Acord testified Dyer raped her when she returned to their home from a battered women's shelter. Although Dyer has not been retried on the reversed counts of rape, burglary, and unlawful imprisonment, Dyer admitted in 1982 to his prison classification counselor that he had "only victimized his wife" and not the two other rape victims.[3]
In August 1981, Dyer married his current wife, Rennetta. They have three children, two of whom were born after Dyer and his family began participating in family visits. During a family visit, an inmate and his or her family member(s) are placed in a private visiting unit, such as a mobile home or similar structure.
In January 1995, during an extended family visit, an inmate at Clallam Bay Corrections Center assaulted his wife with a kitchen knife. The state contends the assault would likely have ended in her death had the inmate not been shot and wounded by correctional staff. As a result of this incident, the Legislature enacted RCW 72.09.490, which provides the Department of Corrections (DOC) "shall establish a uniform policy on the privilege of extended family visitation." RCW 72.09.490(1). Subsequently, DOC issued Division of Prisons Directive 590.100 relating to extended family visiting, which to became effective on February 13, 1995.
At the time of implementing the directive, the Director of the Division of Prisons, Tom Rolfs; wrote a letter to all superintendents. The letter included guidelines that would be followed as part of the implementation. The guidelines provided that each inmate currently approved for participation in the extended family visits would be reviewed for eligibility under the new policy. A superintendent has discretion to disapprove any currently approved participant or pending application based upon failure to meet the provisions of the new policy. A one-time exception (grandfathering) for inmates may be made by the superintendents for inmates "who have been successfully participating in the program, or who have made application prior to January 10, 1995; and who are determined not to present security or safety concerns for the program or participants."[4] However, this one-time exception is not to be granted if it falls within policy *910 provisions: including a history of domestic violence.
The new policy provides that inmates "may be excluded from participation if they have a documented history of domestic violence against any person." Division of Prisons Directive 590.100(D)(4)(i) (emphasis added). As the Court of Appeals stated, this reflects the concern that "an inmate with such proclivities might abuse or take a family member hostage during an extended family visit."[5]
To assure proper documentation, this directive required that any action taken with regard to an extended family visit "will be permanently filed in the Offender Central File, Section 4, with all supporting documents."[6] When the new directive was implemented, all inmates then participating in extended family visits were to have a record review to determine their eligibility. Dyer's file was devoid of such documentation, and it does not appear he was reviewed under the new directive. Unaware of this oversight, staff at the Washington State Reformatory (Reformatory) allowed Dyer to continue participating in extended family visits.
In November 1995, Dyer was transferred from the Reformatory to Airway Heights, where authorities did review his suitability for continued participation in extended family visits. In compliance with the provisions of the directive, they terminated his eligibility due to his history of violence. Although in March 1996, DOC incorrectly concluded that Dyer's current wife had been his victim, the record permits an inference that DOC relied on information of domestic violence against his former wives.
Dyer administratively appealed the denial to DOC headquarters. Initially, it was again reviewed by staff at Airway Heights and ultimately, on August 5, 1995, the Deputy Director of the Division of Prisons affirmed the decision to deny Dyer's extended family visits. In doing so, he found that Dyer's criminal history "clearly reflects a pattern of domestic violence as well as a number of brutal sexual assaults."[7] In fact, he questioned why Dyer was not terminated in February 1995, when a comprehensive review was supposed to have been conducted. In conclusion, the Deputy Director found that Dyer "clearly does not qualify for participation in the extended family visits program based on existing standards."[8]
In March 1995, the Indeterminate Sentence Review Board (ISRB) considered Dyer for parole, but found him not parolable and added 60 months to his minimum term. The ISRB's report noted that Dyer has a tendency toward denial of abuse of women.

PROCEDURAL HISTORY
Dyer has exhausted every administrative remedy available to him to address his denial by Airway Heights of his continued participation in the extended family visits program.
In December 1996, Dyer petitioned the Washington State Supreme Court for a writ of mandamus, asking the Court to compel DOC to allow him to participate in extended family visits. This case was later transferred to the Court of Appeals as a personal restraint petition (PRP). The PRP was denied on January 13, 1999, because of Dyer's history of domestic violence.
Dyer then filed a motion for discretionary review, which was denied on March 29, 1999. Dyer also filed a motion for modification of the ruling in April 1999. On September 10, 1999, the Supreme Court remanded the case back to DOC for reconsideration of Dyer's termination from the extended family visits program. In a letter to Dyer's counsel, DOC Superintendent Dan Snyder informed counsel that he had reviewed Dyer's case. Based on "legitimate penological reasons," Snyder denied Dyer's readmission to the extended family visits program.[9] After Dyer's counsel responded, Snyder reaffirmed his previous decision.
*911 On May 4, 2000, this Court accepted review of Dyer's PRP.

ANALYSIS
Standard of Review
To prevail on a PRP alleging constitutional error, the petitioner must show he or she is under restraint and the restraint is unlawful under the provisions of RAP 16.4(c). In re Addleman, 139 Wash.2d 751, 753, 991 P.2d 1123 (2000). Dyer has been restrained; he is incarcerated. He must show the denial of extended family visits is a condition or manner of restraint that is "in violation of the Constitution of the United States or the Constitution or laws of the State of Washington." RAP 16.4(c)(6).
Courts review prison disciplinary proceedings to determine "whether the action taken was so arbitrary and capricious as to deny the petitioner a fundamentally fair proceeding." In re Personal Restraint of Reismiller, 101 Wash.2d 291, 294, 678 P.2d 323 (1984). "A hearing is arbitrary and capricious only if no evidence supports the action taken." In re Personal Restraint of Anderson, 112 Wash.2d 546, 549, 772 P.2d 510 (1989). "Thus, a hearing is not arbitrary if some evidence supports the conclusions of the prison disciplinary board." Anderson, 112 Wash.2d at 549, 772 P.2d 510.
Liberty Interest
Due process protects against the deprivation of life, liberty, or property without due process of law. U.S. Const. amend. XIV, § 1. In the instant case, the question is whether Dyer has established a liberty interest in extended family visits.
Protected liberty interests "`may arise from two sourcesthe Due Process Clause itself and the laws of the States.'" Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (quoting Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983)). The due process clause of the federal constitution does not, of its own force, create a liberty interest under the facts of this case, for it is well settled that an inmate does not have a liberty interest in the denial of contact visits by a spouse, relatives, children, and friends. Block v. Rutherford, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). The denial of a prisoner's access to a particular visitor "`is well within the terms of confinement ordinarily contemplated by a prison sentence.'" Thompson 490 U.S. at 461, 109 S.Ct. 1904 (quoting Hewitt, 459 U.S. at 468, 103 S.Ct. 864). In addition, Dyer concedes that there is no claim of a constitutionally protected liberty interest in extended family visits. Therefore, Dyer has no constitutional interest in extended family visits protected by the due process clause itself.
However, state statutes or regulations can create a due process liberty interest where none otherwise would have existed. Thompson, 490 U.S. at 461, 109 S.Ct. 1904. Prior to Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995), for a state law to create a liberty interest, it had to have contained "`explicitly mandatory language,'" in connection with the establishment of "`specified substantive predicates,'" to limit discretion. Thompson 490 U.S. at 463, 109 S.Ct. 1904 (quoting Hewitt, 459 U.S. at 472, 103 S.Ct. 864). In Sandin, the United States Supreme Court held that liberty interests are not created by negative implications from mandatory language in prison regulations. Rather, to create a liberty interest, the action taken must be an atypical and significant deprivation from the normal incidents of prison life. Sandin, 515 U.S. at 484, 115 S.Ct. 2293. There is a hardship in that Dyer cannot participate in the extended family visits program; however, this is not an atypical and significant hardship. Dyer still has regular visitation rights to spend time with his wife and children.
Extended family visitation is a privilege. Statutory language explicitly confirms that extended family visitation is a privilege.[10] *912 The privilege of extended family visits is not a normal incident of prison life. It is a privilege granted only to a few qualified inmates.
It is not in the best interest of the courts to involve themselves in the "day-to-day management of prisons, often squandering judicial resources with little offsetting benefit to anyone." Sandin, 515 U.S. at 482, 115 S.Ct. 2293. "[C]ourts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." Sandin, 515 U.S. at 482, 115 S.Ct. 2293.
The United States Supreme Court has recognized that states can interpret their own constitutions to provide greater protection for individual rights than the United States Constitution because each state has the "`sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.'" State v. Gunwall, 106 Wash.2d 54, 59, 720 P.2d 808 (1986) (quoting PruneYard Shopping Ctr. v. Robins, 447 U.S. 74, 81, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980)). "When asked to do so, this Court will consider whether Washington's constitution provides greater protection than parallel federal provisions, but only if the argument adequately addresses the principles announced in State v. Gunwall." State v. Lee, 135 Wash.2d 369, 387, 957 P.2d 741 (1998). Absent such an argument, "this Court will interpret the Washington constitution coextensively with its parallel federal counterpart." Lee, 135 Wash.2d at 387, 957 P.2d 741. In addition, Washington's due process clause does not afford a broader due process protection than the Fourteenth Amendment. See generally State v. Ortiz, 119 Wash.2d 294, 304, 831 P.2d 1060 (1992). Although the State analyzed the Gunwall factors, concluding a coextensive provision, Dyer failed to provide any analysis. Hence, in the absence of the petitioner's Gunwall analysis, we presume a coextensive provision. Accordingly, we do not address Dyer's contentions that more protection is required by the state constitution.
An individual claiming a protected interest must have a legitimate claim of entitlement to it. Thompson, 490 U.S. at 460, 109 S.Ct. 1904. Although Dyer argues that he is an eligible candidate to continue in the extended family visits program because he has participated in the program, Dyer falls under the exception to extended family visits with his prior history of domestic violence to former spouses. Based upon the new policy, Dyer should have had his extended family visits terminated in February 1995. Therefore, he does not have administrative entitlement to such a privilege. In addition, Dyer argues that DOC relied on unsubstantiated hearsay of presentence reports alleging Dyer's domestic violence against his former wives. However, the exception does not state convictions for domestic violence, but rather a documented history of domestic violence against any person. Division of Prisons Directive 590.100(D)(4)(i). Moreover, evidence rules do not apply to habeas corpus proceedings pursuant to ER 1101(c)(3).
Although Dyer was unable to establish that he has a liberty interest in extended family visits, he concedes that he was afforded administrative remedies. Dyer's application was not only reviewed by staff at Airway Heights and DOC, but has been reviewed numerous times by the Court of Appeals and the Supreme Court.
Dyer also contends that he has a Fifth Amendment right under the Washington and United States Constitutions. However, there are no arguments in which the Fifth Amendment is raised. Conclusory allegations of constitutional violations are insufficient to support a personal restraint petition. In re Personal Restraint of Cook, 114 Wash.2d 802, 813, 792 P.2d 506 (1990). Hence, Dyer's Fifth Amendment argument does not warrant review.
Abuse of Discretion
Dyer argues that DOC's denial of extended family visit privileges is arbitrary and capricious because DOC did not follow the rules, regulations, and policies of Division of Prisons Directive 590.100. Dyer argues that *913 while DOC has the discretion to deny extended family visit privileges to inmates with a documented history of domestic violence, the evidence of domestic violence in his case is weak. Dyer also argues estoppel, following his rationale that since he was previously approved for extended family visit privileges (prior to the new directive), he has earned the privilege to continue to participate in extended family visits.
"[R]eview of prison disciplinary proceedings is properly limited to a determination of whether the action taken was so arbitrary and capricious as to deny the petitioner a fundamentally fair proceeding." Reismiller, 101 Wash.2d at 294, 678 P.2d 323. A decision made by an agency is "arbitrary and capricious" only if it is "`willful and unreasoning action in disregard of facts or circumstances.' "United Parcel Service, Inc. v. Dep't of Revenue, 102 Wash.2d 355, 365, 687 P.2d 186 (1984) (quoting Skagit County v. Dep't of Ecology, 93 Wash.2d 742, 749, 613 P.2d 115 (1980)). An action can be depicted as arbitrary and capricious only if the agency's action is wholly unsupportable. In re Stockwell, 28 Wash.App. 295, 302, 622 P.2d 910 (1981).
A broader scope of review is undesirable in that it would tend to undermine prison administrators' decisions and lead to greater involvement of the courts in matters of internal prison discipline.
We find the documented history of domestic violence against two former wives compelling, in spite of the absence of any history of abuse by Dyer on extended family visits.
Dyer does not meet the criteria for participation in the extended family visits program as laid out by rule, and DOC is following the language of its own policies. The agency's actions are not arbitrary and capricious; they are supported by a documented history of domestic violence and a criminal conviction showing a pattern of abuse toward women. Even petitioner's supplemental brief states that "while DOC is correct in asserting that Mr. Dyer may be excluded because of a documented history of domestic violence, it is not required to do so."[11] Moreover, Dyer admitted in 1982 to his prison classification counselor that he had "victimized his wife."[12] In essence, Dyer has conceded that DOC acted properly; he contends, however, that since DOC has the discretion to violate its own standards, the agency should extend the privilege of visitation to a noncomplying inmate. At best, this argument confuses "arbitrary and capricious" review with de novo review.
Even if an inmate were qualified to participate in extended family visits, "if it is determined there is reason to believe that an offender ... is a danger to him/herself, the visitor(s), or to the orderly operation of the program, the Superintendent may exclude the offender from the program."[13] This determination may be based upon, but is not limited to, the inmate's crime, and current and prior behavior. Dyer has conceded that he may be excluded from the program because of a documented history of domestic violence. However, even if he were an eligible inmate, the superintendent has the authority to weigh the danger factor as well as the orderly operation factor and decide to deny, suspend, or terminate the extended family visits privilege.[14]
Adequate Review
Dyer argues that he should be entitled to a reference hearing because he has been unable to provide proof, not available to him without the discovery process, to show DOC reviewed his suitability for extended family visits under the new policy.
To support a request for a reference hearing, "the petitioner must state with particularity facts which, if proven, would *914 entitle him to relief." In re Personal Restraint of Rice, 118 Wash.2d 876, 886, 828 P.2d 1086 (1992). Rice continues as follows:
If the petitioner's allegations are based on matters outside the existing record, the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief. If the petitioner's evidence is based on knowledge in the possession of others, he may not simply state what he thinks those others would say, but must present their affidavits or other corroborative evidence.
Id.
Dyer's history of domestic violence is not outside the existing record. Incidents are found in both the presentence investigation report and the unpublished opinion of Dyer's conviction. Moreover, Dyer has not requested a reference hearing with particularity as to the facts. Rather, his counsel has provided faxed responses from the superintendent at the Reformatory about the review process for extended family visits.
Dyer argues that he should receive a writ of mandamus requiring Airway Heights and DOC to review his suitability to participate in the extended family visits program. Dyer argues that the suggestion to reevaluate will fall on deaf ears unless this Court not only mandates Airway Heights and DOC to follow Division of Prisons Directive 590.100 but also gives guidance to ensure against abuse of discretion.
Mandamus is an appropriate action to compel a state official to comply with law when the claim is clear and there is a duty to act. Walker v. Munro, 124 Wash.2d 402, 408, 879 P.2d 920 (1994). On the other hand, the action of mandamus is not proper to compel a discretionary act. State ex rel. Burlington N., Inc. v. Wash. Utils. & Transp. Comm'n, 93 Wash.2d 398, 410, 609 P.2d 1375 (1980). The act of mandamus compels performance of a duty, but cannot lie to control discretion. Benedict v. Bd. of Police Pension Fund Comm'rs, 35 Wash.2d 465, 475, 214 P.2d 171 (1950).
The directive specifically states that extended family visits must be approved by the superintendent, and that the superintendent has the authority to approve, deny, suspend, or terminate visits.[15] In addition, the new policy provides that inmates "may be excluded from participation if they have a documented history of domestic violence against any person."[16] Since the superintendent has the discretion to grant or deny extended family visits according to policy, a mandamus action is not proper.

CONCLUSION
The Court of Appeals properly determined that Dyer was not entitled to extended family visits under the Division of Prisons Directive. The DOC did not act arbitrarily or capriciously in determining Dyer's eligibility for the program. Dyer's application for extended family visits has had adequate review through many administrative avenues.
In sum, finding that the extended family visits program is a privilege, and that privileges do not constitute a liberty interest, we dismiss the petition under RAP 16.4(c)(6). We therefore affirm the Court of Appeals' decision.
GUY, J.P.T., SMITH, MADSEN, BRIDGE, JJ., concur.
TALMADGE, J., did not participate.
SANDERS, J. (dissenting).
There is no iron curtain drawn between the Constitution and the prisons of this country.
Wolff v. McDonnell, 418 U.S. 539, 555-56, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (White, J.).
In 1995 the Washington State Legislature mandated that "[t]he department [of Corrections] shall establish a uniform policy on the privilege of extended family visitation." RCW 72.09.490(1). Complying with this statutory directive the Department of Corrections (DOC) promulgated regulation DOP 590.100 which, at its outset, states its purpose:

*915 To provide eligible offenders the opportunity to maintain relationships with authorized family members; to maintain marriages which existed prior to incarceration in DOC; and to provide an incentive for offenders to maintain a positive behavior and attitude while incarcerated.
Resp't's Suppl. Br. Regarding Exclusion from the Extended Family Visit Program Based Upon Crime and History of Domestic Violence, App. D (DOC, Division of Prisons, Extended Family Visiting, DOP 590.100) (hereinafter Resp't's Suppl. Br., App. D (DOP 590.100)).
Notwithstanding the obvious nobility of a prison policy which assists inmates to maintain their marriages and family ties under such trying circumstances, the facts of this case illustrate the human tragedy and suffering imposed not only upon the inmate but his wife and small children when prison officials cease to practice the purpose which they have embraced in theory. Similarly, such travesty is not remitted by courts which fail to stand behind the legal rights of prisoners touting noninvolvement in the "`day-to-day management of prisons'" (majority at 912 quoting Sandin v. Conner, 515 U.S. 472, 482, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995))) as superior to the discharge of their duty to protect the legal rights of every citizen, including those behind bars.
Mr. Richard Dyer was disqualified from further participation in the program after more than 10 years of successful family visits upon the DOC claim that he was ineligible for future participation pursuant to subpart D.4.i. of the new regulation. This section provides,
Offenders may be excluded from participation if they have a documented history of domestic violence against any person.
Resp't's Suppl. Br., App. D (DOP 590.100-D.4.i.).
The regulations further define "domestic violence":
Any act of violence or abuse directed toward a family or household member. Family or household members include children, spouse, persons who have a child in common regardless of whether they have been married or have lived together at any time, persons related by blood or marriage, and persons who have resided together in the past.
Id. App. D (DOP 590.100 DEFINITIONS).
Although it would seem the purpose of this visitation exception is to protect potential visitors who were previously victimized by the prisoner from the likelihood of repetitive violence (and the department here initially justified termination of Dyer's extended family visits exactly upon that factually mistaken ground), it now appears the department claims to deny this prisoner extended family visits with his wife and children not because the prisoner has, even allegedly, committed an act of domestic violence directed toward any of them, but rather because the department claims the prisoner perpetrated domestic violence against his first wife with whom he has had no contact for 30 years and his second wife with whom he has had no contact for 20 years. It is left to the imagination how such a claim, even if it is factually accurate, may fit within the plain language of the regulation much less advance its stated purpose.
I make this preliminary point because "domestic violence" is defined as "[a]ny act of violence or abuse directed toward a family or household member" when, in fact, neither the first nor the second wife are now part of the prisoner's "family" nor were they his household members even at the time of his initial incarceration. Resp't's Suppl. Br., App. D (DOP 590.100 DEFINITIONS). Rather his "family" is his wife Rennetta, and their three small children, none of whom have had any physical conflict with this husband and father.
Moreover, even if we assumed ex-wives still qualify as "family" members for the purpose of this regulation, it remains to be proved that the prisoner in fact perpetrated domestic violence against either of them.
The regulation references a "documented history of domestic violence," id. App. D (DOP 590.100-D.4.i.), without further definition of what this might be. The DOC, however, was quick to qualify during oral argument that false allegations of domestic violence, even though reduced to writing, *916 especially when controverted by other writings, are not enough. In re Personal Restraint of Dyer, No. 67673-9 (argued Oct. 17, 2000), oral argument tape 1, side 1.
Nevertheless the department asserts on just such sparse and self-contradictory record that this prisoner should be denied his right to extended family visits without even affording the prisoner the slightest opportunity to participate in a hearing, even before prison officials, where contested facts could be determined, if only summarily and superficially.
According to the DOC there were two alleged instances of domestic violence which disqualify this prisoner from further extended family visits, one which occurred in January 1972 with his first wife, Janet Cutting, and the other involving an alleged incident with his second wife, Ethel Acord, in 1981.
As to the earlier instance, the department states in its September 30, 1999, letter to Dyer's attorney, Leta Schattauer:
A review of inmate Dyer's pre-sentence investigative reported [sic] dated February 16, 1982, shows inmate Dyer's first wife, Janet Cutting, was issued a restraining order based on inmate Dyer's violence against her.
Resp't's Suppl. Br., App. J (Letter from Superintendent Snyder to Attorney Leta J. Schattauer (Sept. 30, 1999)).
As to this claim the record shows that an ex parte restraining order was indeed entered against Mr. Dyer in January 1972 which provides he "is immediately restrained from coming about or molesting the plaintiff and minor child of the parties, wherever they may be...." Dyer v. Walter (Wash. No. 66348-3), Pl.'s Reply to Resp. re Pet. against State Officer and for Writ of Mandate and Request for Referral of Questions of Fact, Ex. R (attachment). However, there is nothing in the record suggesting that there was any factual predicate for this routine ex parte order, nor does an order which prohibits future conduct imply such conduct necessarily occurred in the past. To the contrary, the record shows that Mr. Dyer was in fact serving his country in Vietnam at the time, not to return until September 1972, after his first wife had made the divorce final in his absence and the temporary restraining order dissolved by its own terms. The record also affirmatively shows that Mr. Dyer denies any act of domestic violence against his first wife. And there is nothing in the record, including this naked restraining order, to the contrary.
The second alleged incident of domestic violence involved his second wife, Ethel Acord. The September 30, 1999 letter from the DOC states in this regard:
Inmate Dyer was convicted of raping his second wife. The conviction was overturned in 1984, and remanded for a new trial. A review of the appeal decision shows the conviction was overturned because of procedural errors. While I cannot conclude inmate Dyer's innocence or guilt in this incident, I cannot ignore the facts presented which suggest he committed domestic violence against his second wife.
Resp't's Suppl. Br., App. J (Letter, Sept. 30, 1999) (emphasis added). In point of fact, this conviction was overturned, and Mr. Dyer states in the record that he did not rape his second wife nor engage in acts of domestic violence against her. More fundamentally, based on all of this, the superintendent states, "I cannot conclude inmate Dyer's innocence or guilt in this incident ...." (id.) yet, in contradiction, denies Mr. Dyer and his family participation in this extended family visits (EFV) program as if he were actually guilty.
The majority also seems to emphasize an alleged hearsay account that Dyer stated he "victimized" his second wife, although that is not the stated basis for the department's revocation of his participation in the program nor does the statement, taken at face value, necessarily indicate an act of domestic violence in any event.
Such is the sum total of the "facts" upon which the department justifies its actions.
Before embarking on further legal analysis, I think it is important to notice several additional facts regarding the prisoner and his family which demonstrate the importance of this program to them.
*917 First Dyer married his current wife approximately a year before incarceration and had one child before incarceration. They had two children after incarceration as a result of visits sanctioned by DOC. Early on, DOC commissioned a psychological evaluation of the prisoner which recommended these extended family visits as highly beneficial and most appropriate.
These small children and their mother, the prisoner's wife, have, without doubt, suffered mightily as a result of the DOC's decision to terminate extended family visits in 1995. As the majority relates, they have moved their household to Oklahoma for economic reasons and find it difficult to come to the State of Washington to visit their father and husband more frequently. Understandably they would make the most of their visit in an atmosphere other than the sterility of the prison visiting room under the constant watchful eye of prison guards. One of Dyer's small children, Lisa, wrote the prison superintendent pleading her case that extended family visits be reinstituted with her dad:
Trailer viest mean more to me because I can talk to my dad without outh peple there It makes me fell like a real family. So I can give my dad a huge and a kiss when ever I want to. So we can be like a normal family. We can play games whithout outher people there. We are a faimily but not with out him

You friend

Lisa
Dyer v. Walter (Wash. No. 66348-3), Pet. against State Officer and for Writ of Mandate, Ex. N.
His elder daughter, Stephanie, wrote the following on August 30, 1997:
My name is Stephanie Dyer. I'm 16 yrs-old and am the daughter of Richard Dyer.
What I don't understand is why my family doesn't have Extended Family Visits anymore. We never did anything to abuse that privilege.
In an E.F.V. we can act more as a family. Our family looks forword to our E.F.V.'s. We cherish them. It's easier to be yourself and be more affectionate in an E.F.V.
In an E.F.V. our family bonds and becomes closer. Things other families take for granted, our family greatly appreciates. Like playing games, or just eating a meal together.
Our family is more comfortable in an E.F.V. It's hard to be comfortable in a visiting room with guards constantly looking over your shoulder.
Please give our E.F.V.'s back. It's the only time we can feel like a normal family.
 Sincerely,
 Stephanie Dyer
Id. Pet. against State Officer and for Writ of Mandate, Ex. N.
These letters convey a force of reason and familial love which stands as living testament to the true purpose underlying these regulations, a purpose somehow lost in application.
Although the prison regulation provides the superintendent may allow extended family visits by exception, even when the inmate does not qualify under the letter of the rule, an exception for Mr. Dyer and his family was nonetheless denied by the superintendent, Dan Snyder, who claims, "There is no modification to program that would allow an extended family visit within the limits of risk acceptable to the Department." Resp't's Suppl. Br., App. J (Letter, Sept. 30, 1999). The superintendent does not explain, however, how "limits of risk acceptable to the Department," id., are exceeded by a continuation of extended family visits under circumstances which include more than 10 years of successful extended family visitations.
The duration of Mr. Dyer's incarceration also bears some witness. Convicted of a double rape in 1981 he was sentenced to prison under the jurisdiction of the Indeterminate Sentence Review Board (ISRB) for a maximum term of life. In 1981 the Sentencing Reform Act (SRA), chapter 9.9A RCW, was passed. Had Mr. Dyer committed these offenses after passage of the SRA, and if he were given a midrange standard sentence with good behavior, he would have served 74 months according to ISRB calculations and been released in 1989. Resp't's Suppl. Br., *918 App. C, at 1 (ISRB Decision and Reasons (Mar. 8, 1995)). The ISRB is to be guided, at least in part, by the duration of these standard range sentences. RCW 9.95.013 (requiring decisions of the board to be reasonably consistent with the ranges, standards, and purposes of the SRA). However, the ISRB nonetheless has continued to deny Mr. Dyer parole based, at least in part, on his continued exercise of his right not to admit guilt with respect to these two convictions. Resp't's Suppl. Br., App. C, at 4 (ISRB Decision and Reasons) (relying upon Dyer's "denial of the crime" as a fact supporting its determination). Under the SRA, however, denial of guilt is no basis to extend the duration of incarceration.
The majority affirms the department's denial of participation in the EFV program based upon its double legal conclusion that (1) "extended family visits are not a liberty interest" and (2) "the Department of Corrections did not act arbitrarily or capriciously in following the Division of Prisons Directive." Majority at 908-09. I take issue with both.

I. Extended Family Visits as a Liberty Interest
A liberty interest may be created by administrative regulation where an "atypical and significant hardship" is imposed on an inmate "in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). These rights have also been recognized as matters of state constitutional law. See Cooper v. Morin, 49 N.Y.2d 69, 399 N.E.2d 1188, 1195, 424 N.Y.S.2d 168 (1979) (requiring program of contact visitation to be instituted within reasonable period of time). In this state a "normal incident[ ] of prison life" (majority at 912 (citing Sandin, 515 U.S. at 484, 115 S.Ct. 2293)) is the right of qualified inmates to participate in the EFV program. DOP 590.100 DIRECTIVE ("Each Division of Prisons' facility shall provide an extended family visit program for eligible offenders." (emphasis added)).
For the 11 years prior to November 1995 (including at least three visits after the implementation of DOP 590.100), EFVs were also as a practical matter part of the ordinary incidents of prison life for Richard Dyer. Dyer recalls being reviewed by the DOC and approved for continuation in the program after implementation of the new policy. His claim on this disputed point is badly misrepresented by the majority, which omits even mention of his position and assumes the conclusion in its characterization. See majority at 910 ("Dyer's file was devoid of such documentation, and it does not appear he was reviewed under the new directive."). But DOC assumes there was no review only because it has no record of any such proceeding, which would be required under DOC policy. Thus the admitted breach of one policythe absence of the required reviewis apparently substantiated by the assertion DOC didn't violate its policies.
Unlike Sandin, in which the conditions of confinement did not change where a prisoner was punished by segregated confinement, DOC's decision resulted in a significant change for Dyer and the loss of a status he had peacefully enjoyed for 11 years based on exactly the same record that qualified him for that status in the first place.
Whether or not Dyer had a prior liberty interest in a program not formalized by express rule, such an interest was certainly created by enactment of DOP 590.100. "[T]he most common manner in which a State creates a liberty interest is by establishing `substantive predicates' to govern official decisionmaking, and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." Ky. Dep't of Corrections v. Thompson, 490 U.S. 454, 462, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (citation omitted).
The majority's assertion about not involving the court in the "`day-to-day management of prisons'" (majority at 912 (quoting Sandin, 515 U.S. at 482, 115 S.Ct. 2293)) is nothing more than allowing an "iron curtain [to be] drawn between the Constitution and the prisons of this country." Wolff, 418 U.S. at 555-56, 94 S.Ct. 2963. The majority says DOC's decision to place someone in the program is a matter of discretion, majority at 914, but there is no discretion to deny an entitlement established by rule and required *919 for a qualified recipient. See, e.g., State v. T.K., 139 Wash.2d 320, 331, 987 P.2d 63 (1999) (creating nondiscretionary obligation once the conditions of the statute in which "shall" is used are met). For these reasons I conclude a liberty interest in extended family visits exists in this state.

II. Arbitrary and Capricious
A decision is arbitrary and capricious if it is "`willful and unreasoning action, without consideration and in disregard of facts and circumstances.'" City of Bellevue v. E. Bellevue Cmty. Council, 138 Wash.2d 937, 947-48, 983 P.2d 602 (1999) (quoting Pierce County Sheriff v. Civil Serv. Comm'n, 98 Wash.2d 690, 695, 658 P.2d 648 (1983)). DOC's revocation of Dyer's status was arbitrary and capricious because it disregarded facts and circumstances unique to Dyer and also represents a result contrary to DOC policy. Dyer has a legitimate expectation of freedom from arbitrary action which dictates being treated consistent with the statutes and policies governing his incarceration. See Williams v. Seattle Sch. Dist. No. 1, 97 Wash.2d 215, 222, 643 P.2d 426 (1982).
The reason originally stated for revocation of extended family visit privileges, domestic violence against his current family, was completely baseless. DOC erroneously claimed a history of domestic violence against Dyer's current spouse Rennetta. This was simply wrong, but it was not until DOC was notified of this fact that it alleged other bases for revocation of Dyer's status. Dyer denies these additional allegations of domestic violence, a fact the majority also neglects to mention (or consider).
The majority tortures this point, saying, "In essence, Dyer has conceded that DOC acted properly," and "Dyer has conceded that he may be excluded from the program because of a documented history of domestic violence." Majority at 913. In fact, Dyer's entire argument is premised on the idea DOC could exclude an inmate if it relied upon a legitimately documented history of domestic violence, but there was no such history (or valid reliance) here. The majority's mischaracterization of Dyer's position by imprecise use of his argument disingenuously concedes the issue in lieu of persuasive legal analysis or valid factual support for DOC's position.
The subsequent rationale offered by DOC relies on a factually erroneous view of Dyer's prior record. DOC apparently relied on the following to establish this "pattern" of domestic violence: (1) the 1982 pre-sentence investigation (PSI); (2) a 1972 restraining order filed against Dyer by his first wife; and (3) a conviction for raping his second wife which was subsequently reversed on appeal.
The majority also cites the 1982 PSI numerous times as proof Dyer "`victimized his wife.'" Majority at 909, 913 (quoting Resp't's Suppl. Br., App. B (PSI at 1)). However the same PSI conceded that, "Due to the limited time available for completion of this report, minimal verifications were obtained." Id. App. B (PSI at 2). Dyer fully denies the allegation and objects to the revocation of EFV on the basis of the otherwise unsubstantiated hearsay contained within the report.
As previously shown, the 1972 restraining order relied upon by DOC and the majority merely contains boilerplate language concerning domestic violence commonly used in marital dissolution proceedings. No specific instances of domestic violence were ever alleged or proved, as Dyer was serving our country in Vietnam during the entire period in question!
Finally, Dyer's conviction for the alleged rape of his second wife was reversed by the Court of Appeals which found it to be tainted by impermissible evidence. There is also substantial evidence undermining the veracity of Dyer's second wife and her allegations. For example, in dissolution proceedings her claims that he had not paid child support since the divorce were directly contradicted by receipts, court pleadings, and her own subsequent testimony. A number of factual inconsistencies existed in her testimony as well regarding the alleged rape itself, which she failed to report for a year, and then only after he announced his intention to wed Rennetta. Nor has Dyer been afforded the opportunity to rebut the validity of these *920 problematic hearsay allegations in any subsequent fact-finding proceeding.
DOC also relied on factors which could not lawfully be considered under its own policies. "[T]he violent nature of his crime of commitment," Resp't's Suppl. Br., App. J (Letter, Sept. 30, 1999) is facially irrelevant to denial of EFV participation under the regulatory language of DOP 590.100, which entails only acts of violence or abuse "directed toward a family or household member." Id. App. D (DOP 590.100 DEFINITIONS). Dyer's crime of commitment was not directed toward a family or household member and should not have been considered. If Mr. Dyer had not engaged in criminal conduct he wouldn't be in prison!
The majority relies on DOP 590.100(C)(3), which provides disqualification is authorized if an offender is a danger to himself or others in the program, stating that determination may be based on the inmate's crime, as well as current and prior behavior. Majority at 913. However, DOC never claimed this portion of the regulation supported its decision and admitted in oral argument it did not rely upon this rationale. In re Personal Restraint of Dyer, No. 67673-9 (argued Oct. 17, 2000), oral argument tape 1, side 1. An agency's action may only be upheld on the basis articulated by the agency itself; "the courts may not accept appellate counsel's post hoc rationalizations for agency action." Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 50, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983). This justification referenced by the majority for revocation of Dyer's EFV status is clearly beyond the scope of the regulation at issue and was improperly considered.
No effort was made to evaluate the multitude of facts and circumstances supporting Dyer's position. DOC made no mention of the discrepancies surrounding the restraining order, or the fact that it pertained only to Dyer's first wife, or was issued almost 30 years ago when Dyer was serving his country in Vietnam.
The DOC superintendent also notes Dyer's conviction concerning his wife was overturned, but says "[w]hile I cannot conclude inmate Dyer's innocence or guilt in this incident, I cannot ignore the facts presented, which suggest he committed domestic violence against his second wife." Resp't's Suppl. Br., App. J (Letter, Sept. 30, 1999). This is a non sequitur since innocence is inconsistent with program disqualification. DOC ignores that the conviction was set aside because the nature of the prosecution made it more likely he would be wrongly convicted by joining the counts, the evidence questioning the truthfulness of Dyer's second wife and her claims, and the fact that the case was never retried although it could have been.
The DOC determination rises to the level of willful and unreasoning action when viewed in light of (1) the failure to factually establish Dyer had in fact engaged in domestic violence, even historically; (2) Dyer's 11 years of successful participation in the EFV program; (3) the fact that the contested allegations of domestic violence decades ago have nothing to do with his current family or visitors; (4) his status was revoked on the same record that initially allowed him to qualify; (5) DOC based its revocation on contested facts beyond the scope of the regulation, including a reversed conviction and unrelated behavior; and finally, (6) the clearly stated policies and purpose underlying the EFV program, because of which this court mandated DOC reevaluate the revocation.
We were correct when we noted the "apparent absence of any substantial correctional purpose to be served by termination" in this case. In re Personal Restraint of Dyer, Order (Sept. 10, 1999) (Wash. No. 67673-9). Sadly, this court now refuses to heed its own insight.

Conclusion
Arbitrary denial of EFV rights contrary to DOC policies justifies granting Dyer's PRP and ordering DOC to reinstate his EFV privileges or, at minimum, justifies remanding the case for a reference hearing to resolve issues of fact pertaining to whether Dyer engaged in domestic violence 20 years ago.
This court has an obligation to jealously guard the rights of all of our citizens, even those incarcerated, especially when those *921 rights are violated as a result of the "`day-to-day management of prisons.'" Majority at 912 (quoting Sandin, 515 U.S. at 482, 115 S.Ct. 2293). These prisoners and their families have nowhere to turn but the courts to redress their grievances. By allowing the arbitrary revocation of a regulatory entitlement from this prisoner and his family, the majority has walked away from its responsibility to protect the legal rights of these citizens and whitewashed a travesty of justice. As stated by Justice Brennan in O'Lone v. Estate of Shabazz, 482 U.S. 342, 355, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987):
When prisoners emerge from the shadows to press a constitutional claim .... they speak the language of the charter upon which all of us rely to hold official power accountable.
I therefore dissent.
ALEXANDER, C.J., and JOHNSON, J., concur.
NOTES
[1] The conviction was reversed because if the count concerning Ms. Acord had been tried separately, the forcible rapes of Ms. A and Ms. B would not have been admissible to prove non-consent. Having received a life sentence on the two other counts, Dyer was not retried on the counts concerning Ms. Acord. State v. Dyer, No. 06162-7-II, slip op. at 12 (Wash.Ct.App. Aug. 14, 1984).
[2] Pre-Sentence Investigation, Kitsap County Super. Ct. No. 81-1-00398-1 (Feb. 16, 1982), at 9.
[3] Overview of Pre-Sentence Investigation (Mar. 3, 1982), at 1.
[4] Resp't's Suppl. Br., App. E, Letter from Tom Rolfs to the superintendents (Feb. 24, 1995), at 2.
[5] Order Dismissing Pet., No. 06162-7-II (Jan. 13, 1999), at 4.
[6] Division of Prisons Directive 590.100(E)(8).
[7] Resp't's Suppl. Br., App. F, Letter from Jim Blodgett to Leta Schattauer (Aug. 8, 1996).
[8] Id.
[9] Letter from Superintendent Dan Snyder to Leta Schauttauer (Sept. 30, 1999).
[10] RCW 72.09.470 states, in pertinent part, as follows:

To the greatest extent practical, all inmates shall contribute to the cost of privileges. The department shall establish standards by which inmates shall contribute a portion of the department's capital costs of providing privileges, including television cable access, extended family visitation, weight lifting, and other recreational sports equipment and supplies.
[11] Pet'r's Suppl. Br. at 9.
[12] Overview of Pre Sentence Investigation (Mar. 3, 1982), at 1.
[13] Division of Prisons Directive 590.100(C)(3).
[14] Division of Prisons Directive 590.100(C)(2). In addition, Division of Prisons Directive 590.100(B)(1)(d)-(e) states: "(d). The Superintendent or designee may terminate a family visit. (e). The Superintendent or designee may interrupt or cancel scheduled visits."
[15] Division of Prisons Directive 590.100(C)(2).
[16] Division of Prisons Directive 590.100(D)(4)(i).