

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No.  40881-7-III |
| | ) | |
| AMBER F. KIM, | ) | |
| | ) | |
| Petitioner. | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

COONEY, J. — Amber Kim files this personal restraint petition (PRP) arguing the

Department of Correction's (DOC) transfer of her to a men's facility constitutes cruel and

unusual punishment in violation of article I, section 14 of the Washington State

Constitution.  Because Ms. Kim fails to show the transfer was not reasonably necessary

to accomplish a legitimate penological goal, we deny her petition.

BACKGROUND

Amber Kim[1] was convicted of two counts of aggravated first degree murder,

among other charges, after brutally killing her parents in 2006.  *State v. Kim*, noted at 149

Wn. App. 1058, slip op. at 1-2 (2009).  She was sentenced to life in prison without the

---

[1] Formerly known as Bryan Kim.

possibility of parole. Ms. Kim appealed her convictions, and this court affirmed. *Kim*,

slip op. at 2.

In 2008, Ms. Kim was transferred to the custody of the DOC to serve her sentence

and was housed in a men's facility.

In January 2016, Ms. Kim disclosed to the DOC that she is a transgender woman.

Based on Ms. Kim's disclosure, the DOC assessed her housing placement using the

"Protocol for the Housing of Transgender and Intersex Offenders." Br. of Resp't's

App'x, Ex. 1, Attach. C. The DOC's records indicated that Ms. Kim had not been

involved in any "Prison Rape Elimination Act" related incidents as of that time while also

noting Ms. Kim had a potential for victimization due to her small stature and age. Br. of

Resp't's App'x, Ex. 1, Attach. C. Ms. Kim reported feeling safe to the DOC and

requested to be housed in a two-person cell.

From January 2016 to April 2020, the DOC conducted semi-annual housing

assessments of Ms. Kim as required by the DOC's "Transgender Individuals Policy."

Br. of Resp't's App'x, Ex. 1, Attach. C-N. During that time, Ms. Kim began to state that,

from her subjective view, there were safety issues with continuing housing in a men's

facility. Ms. Kim claimed transferring her to a women's facility would be the only means

of making her feel safe. However, the DOC's records indicated Ms. Kim reported no

incidents of abuse, and the DOC continued to determine the men's facility was an

appropriate housing situation for her. In the assessments, Ms. Kim also claimed instances

2

of corrections officers touching her breasts during searches, but the DOC determined there was no support for these claims.

In February 2020, Ms. Kim requested gender reassignment surgery and began the approval process for the procedure.[2] She was approved for the surgery in March 2021. In May 2023, Ms. Kim decided against moving forward with the surgery and instead wanted to reassess her gender dysphoria after trying less invasive procedures to her face and neck.

During her housing assessment in March 2020, Ms. Kim expressed concern with having a cisgender male cellmate "because of their toxic masculinity." Br. of Resp't's App'x, Ex. 1, Attach. N at 4. She requested to be housed "with someone who is gender queer or trans." *Id*. Ms. Kim also stated she did not feel safe in a men's facility due to the "distinct and real risk of sexual victimization." *Id*. Ms. Kim was questioned further on this statement and did not report imminent safety concerns or risks but said she was more so referring to the unpredictability of prison. Ms. Kim again repeated her request to be transferred to a women's facility during this assessment.

The housing assessment determined there did not appear to be any significant safety concerns with Ms. Kim being housed in a men's prison, but Ms. Kim had stated she would prefer to be housed with other women. In the end, the team was divided on their recommendation as to whether to transfer Ms. Kim to a women's facility. The

---

[2] Ms. Kim had begun hormone replacement therapy in June 2017.

assessment was sent to the multidisciplinary team at the Washington Corrections Center

for Women (WCCW) who determined the "transfer [was] not suitable at this time."

Br. of Resp't's App'x, Ex. 1, Attach. N at 7.

In January 2021, Ms. Kim again expressed a desire to be transferred to the

women's facility. The multidisciplinary team assessed the women's facility would be a

better fit because it "would be a gender-affirming housing assignment" and

recommended Ms. Kim's transfer. Leavitt Decl., Ex. E at 3. Ms. Kim's request to

transfer to a women's facility was subsequently granted based on the "recommendation

[from mental health], Kim's request, and suitable/favorable adjustment" during her time

in the general population at the men's facility. *Id.* at 5. Ms. Kim was transferred to the

WCCW in February 2021.

While housed at the WCCW on March 13, 2024, Ms. Kim was issued a 504

infraction for engaging in a sexual act with another individual. The infraction was based

on a corrections officer's direct observation of Ms. Kim engaging in sexual intercourse

with her cellmate. At the hearing on the infraction, in addition to maintaining she did not

commit the infraction, Ms. Kim argued against the existence of the infraction:

> I would also like to argue that the 504 infraction should not exist in the 1st
> place. All the other serious category [B level 1] infractions are based on an actual
> crime a person can commit in Washington state. . . . However, the statute that the
> 504 infraction was based off of, consensual gay sex was repealed in 1976. It is
> cruel and unusual beyond all belief to tell someone like myself who has life
> without parole and came to prison at 18 that I am never allowed to have love and
> anytime someone is interested in me I have to say no every time forever and then
> even while I'm being a good little inmate give me a major infraction driving the

point home that I will never be allowed to have love ruining my life the life of the person I'm accused of being with in the process both of us are not guilty and the rule itself is unjust.

Br. of Resp't's App'x, Ex. 1, Attach. V. Ms. Kim also maintained consensual sex was permitted in prison.

Ms. Kim's first housing review following her 504 infraction occurred on April 2, 2024. The review mentioned Ms. Kim's 504 infraction but noted an appeal of the infraction was pending. It recommended Ms. Kim continue to be housed in the WCCW.

Ms. Kim's appeal of her infraction was denied on April 9, 2024. On May 10, 2024, a new housing assessment for Ms. Kim was conducted. The updated assessment described Ms. Kim's 504 infraction and portions of the above statement she made during the hearing. It noted that while Ms. Kim had been placed in a single cell in the closed custody unit to reduce the risk of her behavior continuing, the housing change did not eliminate the risk because individuals must shower in groups, and the single stalls are connected to each other. The increased risk of Ms. Kim repeating her behavior was demonstrated by her expressed belief that the rules were not fair and her reference to the incident as "consensual sex with her cell mate" in a phone call. Leavitt. Decl., Ex. I at 3. Moreover, due to differences in the way the women's prison is run, "[e]ven in close custody and a single cell, Ms. Kim would be allowed to mix with other custody levels at various activities . . . which would allow her to continue to pursue sexual relationships." Br. of Resp't's App'x, Ex. 4 at 5-6.

5

Determining there was a risk that Ms. Kim would continue to engage in sexual activity, the assessment recommended her transfer to a men's facility. However, the DOC stated it would continue to review Ms. Kim's housing situation every six months and reassess whether a return to the women's facility would be appropriate. The DOC subsequently transferred Ms. Kim to a men's facility.

Ms. Kim brings this PRP, alleging that her transfer back to a men's facility constituted cruel and unusual punishment in violation of article I, section IV of the Washington State Constitution. We disagree and deny Ms. Kim's petition.

ANALYSIS

To obtain relief through a PRP challenging conditions of confinement, a petitioner must show unlawful restraint pursuant to RAP 16.4. *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 352, 496 P.3d 289 (2021). There is no dispute that Ms. Kim is currently being restrained by the DOC. The question presented is whether her restraint is unlawful.

It is the petitioner's burden to demonstrate error by a preponderance of the evidence. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 814, 792 P.2d 506 (1990). The petitioner must support claims with facts and not merely bald or conclusory allegations. *Id*. The supporting evidence must be based on "more than speculation, conjecture, or inadmissible hearsay," and failure to meet this standard demands dismissal of the petition. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

6

Article I, section 14 of the Washington State Constitution prohibits the State from imposing cruel conditions of confinement. *Williams*, 198 Wn.2d at 368. Whether conditions of confinement are cruel is not dependent on the subjective intent of individual actors within the prison system. *Id*. Rather, an objective test is employed that calls for consideration of "the proportionality of those conditions to legitimate penological justifications." *Id*. A challenge to conditions of confinement requires a showing that "(1) those conditions create an objectively significant risk of serious harm or otherwise deprive them of the basic necessities of human dignity and (2) those conditions are not reasonably necessary to accomplish any legitimate penological goal." *Id*.

In considering challenges to conditions of confinement, "we recognize the practical challenges facing prison administrators and acknowledge that some harsh conditions of confinement that might otherwise be cruel may sometimes be justified by legitimate penological interests, including the health and safety of the prison population as a whole." *Id.* at 367. In reviewing DOC actions, we recognize "the unique means and objectives of penal institutions together with the limited scope of due process rights to which a prisoner is entitled." *In re Pers. Restraint of Reismiller*, 101 Wn.2d 291, 293, 678 P.2d 323 (1984). "'A prison is "a tightly controlled environment populated by persons who have chosen to violate the criminal law, many of whom have employed violence to achieve their ends."'" *In re Pers. Restraint of Grantham*, 168 Wn.2d 204, 215, 227 P.3d 285 (2010) (quoting *Reismiller*, 101 Wn.2d at 294).

7

Courts are ill-situated to involve themselves in the day-to-day management of prisons and doing so often results in a waste of judicial resources, with little to no actual benefit. *In re Pers. Restraint of Dyer*, 143 Wn.2d 384, 393, 20 P.3d 907 (2001). Accordingly, "'[c]ourts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment.'" *Id.* (quoting *Sandin v. Conner*, 515 U.S. 472, 482, 115 S. Ct. 2293, 132 L. Ed. 2d 418 (1995)); *In re Pers. Restraint of Gronquist*, 138 Wn.2d 388, 405, 978 P.2d 1083 (1999) (stating that day-to-day operations of prisons are "peculiarly within the province and professional expertise of corrections officials"); *Sappenfield v. Dep't of Corrections*, 127 Wn. App. 83, 88, 110 P.3d 808 (2005) ("Matters affecting a prison's internal security are generally the province of prison administrators, not the courts."); *In re Pers. Restraint of Goulsby*, 120 Wn. App. 223, 231, 84 P.3d 922 (2004) ("The courts recognize that the prison system should not be micromanaged by the courts, particularly as to issues relating to prison security.").

As a matter of prefatory importance, Ms. Kim is not claiming the DOC's "Transgender Individuals Policy" or its "Protocol for the Housing of Transgender and Intersex Offenders" are unconstitutional. Nor does Ms. Kim argue that housing a transgender female in a male facility amounts to cruel punishment in violation of article I, section 14 of the Washington Constitution. Rather, Ms. Kim maintains *her* transfer from WCCW violated article I, section 14 of the Washington Constitution because it created an objectively serious risk of harm, and the transfer was not required to accomplish any

8

legitimate penological goal. Regardless of whether Ms. Kim's transfer created an objectively serious risk of harm, she has failed to demonstrate the second prong of the analysis: the transfer was not reasonably necessary to accomplish a legitimate penological goal.

Ms. Kim maintains her transfer was not reasonably necessary to accomplish any legitimate penological goal and was not associated with any valid safety concerns, pointing out that her 504 infraction was non-violent because the sexual contact was consensual, and consensual sexual encounters are simply a part of life in prison. She asserts there is no legitimate safety concern necessitating her transfer to a men's prison and any concerns could be adequately addressed in the women's prison as the facility has both close custody and solitary confinement units.

The DOC is charged with maintaining the safety and order of its prisons. RCW 72.09.010(1) (the purpose of the DOC is "to provide the maximum feasible safety for the persons and property of the general public, the staff, and the inmates."). Accordingly, the DOC has a legitimate penological interest in the health and safety of the prison population as a whole. *Williams*, 198 Wn.2d at 367. Sexual activity among inmates is a major security concern as it "has a history of being extremely dangerous and volatile." *Fields v. Smith*, 712 F. Supp. 2d 830, 868 (E.D. Wisconsin, 2010). As noted by the DOC, and referenced in the article cited by Ms. Kim in her petition, the power dynamics between prisoners make it impossible to determine whether sex within the context of a

prison is consensual. Charles Herbert Lea III, et al., *An examination of consensual sex in a men's jail*, 14 Int'l LJ. Prison Health 56 (2018) ("It is also just as hard to determine if a sexual relationship between people in jail and prison settings is coerced or consensual, because relations in these settings are often based on complicated, protective, and exploitative allegiances formed in an oppressive, confined culture."). Additionally, the article relied on by Ms. Kim refers to unprotected sex as a "common experience," highlighting the health risks associated with inmates engaging in sexual contact in the prison context. *Id*.

Here, the DOC has a legitimate penological interest in preventing Ms. Kim from engaging in sexual contact with other inmates, specifically the prevention of penile-vaginal intercourse that could result in sexually transmitted infections and in an inmate becoming impregnated. The DOC is in the best position to decide how to handle this unique and somewhat complex situation. DOC officials are familiar with Ms. Kim's history, behavior, and situation in both the men's and the women's facilities and are better suited to determine which facility is most suitable for Ms. Kim as well as the other inmates given the totality of the circumstances.[3] From the record, it appears that the DOC put significant effort into determining whether to initially transfer Ms. Kim to a women's facility and then similarly took a caution approach to its decision to return her

---

[3] The record indicates there are a number of other transgender inmates housed in the men's facility.

10

to the men's facility. If circumstances change, the DOC continues to reassess Ms. Kim's housing situation every six months, and Ms. Kim can bring any new circumstances or concerns to the DOC's attention during those assessments.[4]

Ms. Kim maintains that the DOC's transfer of her back to the men's prison lacked a legitimate penological purpose because it was not based on any new circumstances. Ms. Kim asserts that the DOC initially determined, following her 504 infraction, that she should remain at the women's facility and then, for no apparent reason, determined she should be transferred out of the women's facility five weeks later. Ms. Kim also asserts the DOC's transfer ignored the initial reasons for her transfer to a women's facility were her safety and well-being.

We agree the initial housing assessment after Ms. Kim's 504 infraction recommended she continue to be housed at the WCCW. However, nothing about this assessment precluded the DOC from further considering the situation and making a different recommendation a few weeks later. If anything, the time between Ms. Kim being issued the infraction and the DOC's decision to transfer her back to a men's facility indicates the DOC carefully considered the situation and weighed available options

---

[4] Ms. Kim objects to the DOC's argument that there is a safety risk in housing her in a women's facility because she could impregnate another inmate as she retained male genitalia. She asserts that she is impotent and maintains the DOC has not demonstrated otherwise. However, as the petitioner, it is her burden to set forth competent and admissible evidence supporting her position. *Cook*, 114 Wn.2d at 813-14.

11

before recommending the transfer. Moreover, an appeal of Ms. Kim's infraction was still pending when the DOC issued its first housing recommendation. It is reasonable to infer that the DOC was awaiting the outcome of that appeal before making any major changes to Ms. Kim's housing situation.

Moreover, Ms. Kim's statement that the DOC's transfer of her to the women's facility was based on safety concerns appears to be unsupported by the record. Rather, in considering Ms. Kim's request to transfer in March 2020, the DOC determined there were no safety concerns with her being housed in a men's prison. When Ms. Kim's transfer request was finally granted in 2021, the stated reason was that a women's facility would provide gender-affirming housing. There was no mention of concerns for Ms. Kim's safety with regard to being housed in a men's facility.

Ms. Kim further argues her transfer was overwhelmingly disproportionate to her behavior underlying the single infraction. She maintains the DOC's treatment of her contrasts with its treatment of her cisgender cellmate, illustrating the DOC's cruel treatment of her. Ms. Kim claims she received further punishment for the infraction by being transferred to a men's facility while her cellmate's custody situation remain unchanged. This argument assumes Ms. Kim's transfer to the men's prison was a punishment for her 504 infraction, but she fails to provide any support for this assertion. Although the 504 infraction precipitated her transfer, her transfer was not a punishment for the infraction. Rather, the infraction and Ms. Kim's statements during the hearing

12

revealed underlying safety concerns that the women's facility determined it was not equipped to address, and it therefore recommended her transfer.

Based on the record before us, Ms. Kim has not met her burden of establishing her transfer back to a men's prison facility constitutes cruel and unusual punishment. Specifically, Ms. Kim has failed to demonstrate the transfer was not reasonably necessary to accomplish a legitimate penological goal.[5]  Accordingly, we deny Ms. Kim's petition.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Murphy, M.

_____
Staab, A.C.J.

---

[5] Ms. Kim also requests this court grant her immediate release as a remedy but raises no argument explaining why such action is necessary.  Accordingly, we decline to address this request.